A. CHRISTOPHER WIEBER, ESQ. (ACW-2077)
Law Office of Mark Scherzer
Attorney for Plaintiff
49 Nassau Street, Fourth Floor
New York, New York 10038
Tel: (212) 406-9606
Email: markscherzerlaw@verizon.net


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CHRISTINE THOMA,                                 :

                 Plaintiff,            :            17-CV-4389 (RWS)(HBP)

    -against-                                      :


THE FOX LONG TERM DISABILITY PLAN      :
and THE LIFE INSURANCE COMPANY OF
NORTH AMERICA,                                   :

             Defendants.          :
-------------------------------------------------------------X



# MEMORANDUM OF LAW IN OPPOSITION TO
# DEFENDANTS' SUMMARY JUDGMENT MOTION
# (AND IN FURTHER SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR
# SUMMARY JUDGMENT)









Of Counsel:
    ▪Mark Scherzer, Esq.
    ▪A. Christopher Wieber, Esq.

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................... i

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................ 1

COUNTER-STATEMENT OF FACTS ................................................................. 2

ARGUMENT ......................................................................................................... 3

   I.   **LINA's CLAIM TERMINATION AND APPEAL DENIAL MUST BE REVIEWED *DE NOVO*** ................................................................... 3

   II.   **EVEN ON DEFERENTIAL REVIEW, LINA'S DECISION TO TERMINATE MS. THOMA'S CLAIM WAS UNREASONABLE, ARBITRARY AND CAPRICIOUS** ..................................................... 10

      A.   **The Court Must Consider LINA's Conflict of Interest as a Factor** .................... 10

      B.   **Deferential Review Does Not Sanction LINA's Dismissal of Ms. Thoma's Treating Physicians' Opinions and her Substantiated Pain Symptoms** ...................... 12

      C.   **Dr. Berman's Opinion Contains Manifest Flaws, and LINA's Unquestioning Acceptance of that Opinion was Arbitrary and Capricious** ........................................... 16

      D.   **Dr. Grattan's Opinion is Not Substantial Evidence to Support LINA's Termination of Disability Benefits** ....................................... 17

      D.   **LINA's Surveillance Evidence Does Not Constitute Substantial Evidence Supporting its Decision to Terminate Ms. Thoma's Disability Benefits** ....................... 18

      F.   **LINA's Appeal TSA Cannot Constitute Substantial Evidence to Support its Decision to Terminate Ms. Thoma's Disability Claim** ................................................... 24

**CONCLUSION** ................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

- Admin. Comm. of the Wal-Mart Stores, Inc. v. Gamboa, 479 F.3d 538 (8th Cir. 2007)... 6
- Barbu v. Life Ins. Co. of N. Am., 987 F. Supp. 2d 281 (E.D.N.Y. 2013) .............. 4, 7, 8, 9
- Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)........................ 12
- CIGNA Corp. v. Amara, 563 U.S. 421 (2011) .................................................... 7
- Cinelli v. Security Pac. Corp., 61 F.3d 1437 (9th Cir. 1995) .............................. 3
- Collins v. Liberty Life Assur. Co., 988 F. Supp. 2d 1105 (C.D. Cal. Dec. 11, 2013)...... 19
- Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161 (4th Cir. 2013) ................................... 4
- Durham v. Prudential Ins. Co. of Am., 890 F. Supp. 2d 390 (S.D.N.Y. Aug. 28, 2012) ... 7
- Francis v. Life Ins. Co. of N. Am., 2011 WL 4102143, 2011 U.S. Dist. LEXIS 103924 (S.D. Cal. Sept. 14, 2011) .................................................................. 5, 8
- Frazier v. Life Ins. Co. of No. America, 725 F.3d 560 (6th Cir. 2016) .............................. 3
- Glenn v. MetLife, 461 F.3d 660 (6th Cir. 2006), aff'd, 554 U.S. 105 (2008) .................. 18
- Gonda v. Permanente Med. Group, Inc., 10 F. Supp. 3d 1091 (N.D. Cal. 2014)........... 4, 8
- Health Cost Controls, Inc. v. Washington, 187 F.3d 703 (7th Cir. 1999) ........................ 6
- Heffner v. Blue Cross & Blue Shield of Ala., Inc., 443 F.3d 1330 (11th Cir. 2006) ......... 6
- Heim v. Life Ins. Co. of N. Am., 2010 WL 5300537, 2010 U.S. Dist. LEXIS 135370 (E.D. Pa. Dec. 22, 2010) ................................................................... 5, 8
- Hunter v. Life Ins. Co. of No. America, 437 Fed. Appx. 372 (6th Cir. 2011) ........... 12, 15
- James v. Life Ins. Co. of N. Am., 2014 WL ____, 2014 U.S. Dist. LEXIS 113776 (S.D. Tex. Mar. 11, 2014), aff'd and adopted, 2014 WL ____, 2014 U.S. Dist. LEXIS 112501 (S.D. Tex. Aug. 14, 2014)................................................................. 4, 8
- Jobe v. Medical Life Ins. Co., 598 F.3d 478 (8th Cir. 2010)........................................ 6
- Johnson v. Life Ins. Co. of N. Am., 2017 WL 4180328, 2017 U.S. Dist. LEXIS 154187 (D. Colo. Sept. 21, 2017) ................................................................... 1, 18
- Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243 (2d Cir. 1999)................. 3
- Larson v. United Healthcare Ins. Co., 723 F.3d 905 (7th Cir. 2013)................................ 6
- Lemon v. E. A. Miller, Inc., 2005 WL 925656, 2005 U.S. Dist. LEXIS 32539 (D. Utah Apr. 18, 2005)................................................................................ 11
- Levitian v. Sun Life & Health Ins. Co., 486 Fed. Appx. 136 (2d Cir. 2012) .................. 11
- Maniatty v. Unumprovident Corp., 218 F. Supp. 2d 500 (S.D.N.Y. 2002)............... 13, 15
- McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161 (6th Cir. 2003)................. 11
- Moore v. Life Ins. Co. of N. America, 2018 U.S. Dist. LEXIS 48313 (W.D. Va. Mar. 23, 2018) ........................................................................................... 8
- Moran v. Life Ins. Co. of N. Am., 2014 WL 4251604, 2014 U.S. Dist. LEXIS 119844 (M.D. Pa. Aug 27, 2014)................................................................... 4, 7, 8
- Noone v. United of Omaha Life Ins. Co., 2016 U.S. Dist. LEXIS 97472 (D. Ore. Jun. 16, 2016) ......................................................................................... 19
- Pettaway v. Teachers Ins. & Annuity Ass'n of Am., 644 F.3d 427 (D.C. Cir. 2011)......... 7
- Pettit v. Life Ins. Co. of N. Am., 2016 U.S. Dist. LEXIS 89327 (D. Md. Jul. 11, 2016).. 4, 7, 8
- Prichard v. Metro. Life Ins. Co., 783 F.3d 1166 (9th Cir. 2015)....................................... 3
- Raybourne v. Cigna Life Ins. Co. of N.Y., 576 F.3d 444 (7th Cir. 2009)...................... 7, 8
- Schully v. Continental Cas. Co., 380 Fed. Appx. 437 (5th Cir. 2010) ............................ 16

- <u>Shaw v. At&T Umbrella Benefit Plan No. 1</u>, 795 F.3d 538 (6th Cir. 2015) .................... 12
- <u>Sigal v. Metro. Life Ins. Co.</u>, 2018 WL 1229845, 2018 U.S. Dist. LEXIS 35534 (S.D.N.Y. Mar. 5, 2018) ............................................................................................... 4
- <u>Silverman v. Teamsters Local 210 Affiliated Health and Ins. Fund</u>, 761 F.3d 277 (2d Cir. 2014) ......................................................................................................................... 5, 9
- <u>Sperandeo v. Lorillard Tobacco Co.</u>, 460 F.3d 866 (7th Cir. 2006) .................................. 4
- <u>Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.</u>, 813 F.3d 420 (1st Cir. 2016) ........................................................................................................................... 8
- <u>Tetreault v. Reliance Std. Life Ins. Co.</u>, 769 F.3d 49 (1st Cir. 2014)............................... 5
- <u>Tuttle v. Std. Ins. Co.</u>, 459 F. Supp. 2d 1063 (W.D. Wash. 2006) ............................ 13, 15
- <u>Woods v. Prudential Ins. Co.</u>, 2007 U.S. Dist. LEXIS 41273, *17 (E.D. Va. Jun. 6, 2007), *rev'd*, 528 F.3d 320 (4th Cir. 2008) ............................................................................. 5
- <u>Woods v. Prudential Ins. Co.</u>, 528 F.3d 320 (4th Cir. 2008) ............................................ 5
- <u>Zuke v. Am. Airlines, Inc.</u>, 644 Fed. Appx. 649 (6th Cir. 2016)..................................... 15

## PRELIMINARY STATEMENT

In their motion for summary judgment, defendants Life Insurance Company of North America ("LINA") and the Fox Long Term Disability Plan (the "Plan") rely on the same flawed strategy that LINA employed to terminate the long-term disability ("LTD") claim of plaintiff Christine Thoma and then to deny her appeal.  At each stage of its decision-making, LINA uncritically adopted the opinion of its latest retained medical consultant – despite glaring inconsistencies and substantial countervailing evidence – and then spoon-fed only that latest opinion to its vocational consultant.  Johnson v. Life Ins. Co. of N. Am., 2017 U.S. Dist. LEXIS 154187, *40-41 (D. Colo. Sept. 21, 2017) ("The Court has no confidence that LINA in fact reached a 'reasoned' decision" where "through the initial determination, first appeal, and second appeal, … LINA simply adopted the last piece of evidence to come in the door").  In both its Rule 56.1 Statement of Facts and Memorandum of Law, LINA summarizes only its own consultants' reports, makes no independent effort to analyze those opinions relative to the opinions of Ms. Thoma's physicians, or the medical records or medical literature on which those opinions were based, and nowhere reconciles the consultants' opinions with earlier medical consultant opinions on which it approved and paid disability benefits.  LINA summarily dismisses this evidence based solely on the broad legal assertion that it is "not required to accord special weight to the opinions of a claimant's physician."  (LINA-Mem. 20.[1])  LINA has offered no explanation for giving this evidence **no weight** or **less weight** in contrast to the blind adherence given to its retained consultants.  Similarly, the Court will search LINA's motion

---

papers in vain for any mention of the vocational evidence submitted by Ms. Thoma, *i.e.*, the 26-page Vocational Evaluation report, by Victor Alberigi (the "Alberigi VE Report," PFF53, 82-85, 97.[2]); documentation supporting the report; or the Disability Determination Explanation issued in conjunction with the approval of disability ("SSD") benefits by the Social Security Administration ("SSA"). As it did in handling Ms. Thoma's claim and appeal, LINA ignores this evidence in its motion papers – not even bothering to give a cursory explanation for dismissing this information. LINA's failure to provide any kind of principled, deliberate consideration of Ms. Thoma's relevant medical and vocational evidence is the very definition of arbitrary and capricious decision-making.

## COUNTER-STATEMENT OF FACTS

Plaintiff respectfully refers the Court to her Counter-Statement to Defendants' Local Rule 56.1 Statement, dated June 18, 2018, for her response to defendants' proffered facts and for her own proposed supplemental findings.[3] Additional citations in this memorandum of law will be to pages in the Administrative Record ("AR"), pages of Ms. Thoma's Memorandum of Law in Support of her Summary Judgment Motion (to be Treated as a FRCP 52 Motion for Judgment on the Administrative Record), hereafter the "Thoma-Mem.," filed May 21, 2018, ECF No. 27, and paragraphs of, or exhibits to, the Declaration of A. Christopher Wieber ("ACWDecl"), ECF No. 25, dated May 21, 2018.

---

[2] Plaintiff's Proposed Findings of Fact and Conclusions of Law, filed May 21, 2018, ECF No. 26, will be cited as "PFF," followed by relevant paragraph numbers.

[3] Defendants' "Local Rule 56.1 Statement of Facts," correctively re-filed on May 24, 2018, ECF No. 32, will be cited as "LINA-56.1" followed by the relevant paragraph number. Plaintiff's response to the LINA-56.1 will be cited as "Counter-56.1," followed by the relevant paragraph number.

**ARGUMENT**

## I.  LINA's CLAIM TERMINATION AND APPEAL DENIAL MUST BE REVIEWED *DE NOVO.*

LINA's reliance on the Appointment of Claim Fiduciary ("ACF") to support a grant of discretionary authority (LINA-Mem. 5-7.) is misplaced.  (Thoma-Mem. 2-4.)  "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies."  Kinstler v. First Reliance Std. Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999) .  The Group Policy (AR16-48.) and its Amendments (AR2-16.) constitute the primary plan documents. Frazier v. Life Ins. Co. of No. America, 725 F.3d 560, 566-67 (6th Cir. 2016) (holding that group insurance policies are generally treated as "benefit plans"); Cinelli v. Security Pac. Corp., 61 F.3d 1437, 1441-44 (9th Cir. 1995) (Board resolution to create a supplemental life insurance plan is not a plan document, because although the "[r]esolution … reflected the Board's decision to create a plan providing the supplemental life insurance benefits…, [i]t was the Aetna policy and its rider that implemented the Supplemental Plan and constitutes the Supplemental Plan").  LINA makes no effort to argue that discretionary authority is granted in the Group Policy or its Amendments, but instead proffers an entirely new document, the ACF.  While it is true that a plan may consist of many documents, courts have generally deemed an ancillary document to constitute an enforceable plan document only if (i) the document was specifically incorporated as a plan document, and (ii) the document was provided to the plan participant.  LINA has established neither of these elements with regard to the ACF.

Courts have repeatedly refused to enforce grants of discretionary authority contained in "extra-plan" documents that are not expressly incorporated into the operative plan document. Prichard v. Metro. Life Ins. Co., 783 F.3d 1166, 1171 (9th Cir. 2015)  (Where the "Plan document is an insurance certificate" that "expressly states that the Plan consists only of (1) 'the

3

Group Policy and its Exhibits, which include the certificate(s)'; (2) '[IBM]'s application'; and (3) 'any amendments and/or endorsements to the Group Policy'" and where "[t]he insurance certificate declares that those documents constitute the 'entire contract,'" summary plan description is not a plan document because it is "[c]onspicuously absent from this exclusive list"); Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161, 170 (4th Cir. 2013) (Prudential's reliance on the ASA [administrative services agreement] is misplaced" because "[t]he STD plan does not incorporate or even refer to the ASA); Sperando v. Lorillard Tobacco Co., 460 F.3d 866, 871-72 (7th Cir. 2006) ("Two other documents, the Certificate and the SPD, do contain language conferring discretion on CNA, but these two documents are not incorporated by reference into the policy or plan"); Sigal v. Metro. Life Ins. Co., 2018 U.S. Dist. LEXIS 35534, *16-18 (S.D.N.Y. Mar. 5, 2018) ("MetLife has failed to carry its burden to demonstrate that the 'Additional Information' sections … were actually incorporated into the Plan" because the "Additional Information" sections were not among the documents specifically incorporated into the "entire contract" by the Certificate, a conceded plan document).

The LINA ACF here was not expressly incorporated into the Group Policy and, consequently, cannot confer discretionary authority.  (Thoma-Mem. 3-4.)  Multiple courts that have examined the LINA ACF and similar LINA group policies have so held.  Barbu v. Life Ins. Co. of N. Am., 987 F. Supp. 2d 281, 286-289 (E.D.N.Y. 2013); Pettit v. Life Ins. Co. of N. Am., 2016 U.S. Dist. LEXIS 89327, *22-25 (D. Md. Jul. 11, 2016); Moran v. Life Ins. Co. of N. Am., 2014 U.S. Dist. LEXIS 119844, *13-19 (M.D. Pa. Aug 27, 2014); James v. Life Ins. Co. of N. Am., 2014 U.S. Dist. LEXIS 113776, *11-14 (S.D. Tex. Mar. 11, 2014), aff'd and adopted, 2014 U.S. Dist. LEXIS 112501 (S.D. Tex. Aug. 14, 2014); Gonda v. Permanente Med. Group, 10 F. Supp. 3d 1091, 1095 (N.D. Cal. 2014) ; Francis v. Life Ins. Co. of N. Am., 2011 U.S. Dist.

LEXIS 103924, *11 (S.D. Cal. Sept. 14, 2011); <u>Heim v. Life Ins. Co. of N. Am.</u>, 2010 U.S. Dist. LEXIS 135370, *4-5 (E.D. Pa. Dec. 22, 2010).

The cases LINA cites for the general proposition that multiple documents can constitute a plan document either also affirm the more specific principle that any proposed document must be expressly incorporated or are inapposite. In <u>Silverman v. Teamsters Local 210 Affiliated Health and Ins. Fund</u>, 761 F.3d 277, 286 (2d Cir. 2014), the Second Circuit invoked an "express incorporation" rationale to hold that a collective bargaining agreement ("CBA") was ***not*** a plan document: "If a plan's trust agreement explicitly provides that employers must fulfill their CBA contribution obligations (or comply with other plan terms), such a provision can subject a delinquent employer to suit under section 502(a) for violating a plan term." 761 F.3d at 287 ("Here, however, no term of the UMM Fund Trust Indenture obligates employers to make prompt payments under their CBAs"). While <u>Silverman</u> observed that "two documents" have generally been recognized as capable of setting forth plan terms – the "trust agreement or contract" and the SPD – it also qualified this statement with the phrase "in various contexts," none of which are present here. The Court's point was that the defendant had found "no case that treats a CBA as a governing plan document setting forth ERISA plan terms." *Id.*

Cases from other circuits cited by LINA also invoke the "express incorporation" principle. This principle was the basis for treating an SPD as a supplemental plan document in <u>Tetreault v. Reliance Std. Life Ins. Co.</u>, 769 F.3d 49, 54-56 (1st Cir. 2014) (formal plan document stated that it "incorporates by reference . . . the terms of the [Limited Long Term Disability] Program as set forth in" the SPD). Conversely, in <u>Woods v. Prudential Ins. Co.</u>, 528 F.3d 320 (4th Cir. 2008), the court referred only to a single plan document – which the lower court described as a "policy," 2007 U.S. Dist. LEXIS 41273, *17 (E.D. Va. Jun. 6, 2007) – and

the parties specifically conceded that language contained in an SPD "is not relevant to our inquiry because it is not contained in the Plan itself." 528 F.3d at 322 fn. 3. Express incorporation was again the guiding principle in Heffner v. Blue Cross & Blue Shield of Ala., Inc., 443 F.3d 1330, 1343 (11th Cir. 2006), where the court rejected plaintiffs' argument that an SPD was the sole plan document, because the SPD specifically stated that benefits were "administered under a contract," and went on to list the various component documents of the contract.

LINA's reliance on Larson is misplaced because that decision does not involve an extra-plan document, but instead stands for the unexceptional principle that "when an employee-benefits plan includes an insurance policy, contract terms mandated by state insurance law become plan terms." Larson v. United Healthcare Ins. Co., 723 F.3d 905, 912 (7th Cir. 2013).

Several of LINA's cases involve circumstances where there was no insurance contract, and the courts were forced to rely on a summary plan description (or "SPD"). Thus, in Admin. Comm. of the Wal-Mart Stores, Inc. v. Gamboa, 479 F.3d 538, 543 (8th Cir. 2007), the court affirmed that "where no formal document exists but there is an insurance contract, the contract and its description … comprise the plan documents." The only reason it then deemed an SPD to constitute a plan document was because "there is no applicable insurance contract" and benefits were provided 'pursuant to the terms set forth in a self-funded written arrangement."[4] 479 F.3d 543-44. Similarly, in Health Cost Controls, Inc. v. Washington, 187 F.3d 703, 712 (7th Cir. 1999), the court treated a Subscriber's Service Agreement as the plan document, even though

---

[4] Indeed, the Eighth Circuit, in Jobe v. Medical Life Ins. Co., 598 F.3d 478, 482 (8th Cir. 2010) (SPD not a plan document), distinguished Gamboa because "there was no written policy underlying the summary plan description," whereas "a detailed written policy comprehensively delineates the rights and responsibilities of the parties in this case."

self-identified as a "summary," where it was uncontested that the agreement was treated by the parties as the plan, all benefits plaintiff received "were determined in accordance with that document," and it was unclear whether the Group Service Agreement (from which the Subscriber's Service Agreement was purportedly summarized) "even exists ... and whether if so it differs from the Subscriber's Service Agreement in any respect material to this case." In contrast, in this case there is a Group Policy which declares itself to be the "entire contract." There is no basis to cast about for additional plan documents.

Like the preceding cases, <u>Pettaway v. Teachers Ins. & Annuity Ass'n of Am.</u>, 644 F.3d 427, 433-434 (D.C. Cir. 2011), had nothing to do with an ACF or ASA, but specifically involved a "Plan Document," "Summary Plan Description," and "Policy Document." While it is true the court held that all three documents were plan documents – and did so without assessing whether there was any form of "express incorporation" – the continuing validity of this holding is in doubt because the Supreme Court held, less than 2 months prior, that "summary documents, important as they are, provide communication with beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan." <u>CIGNA Corp. v. Amara</u>, 563 U.S. 421, 436-38 (2011). <i>See</i>, <i>e.g.</i>, <u>Durham v. Prudential Ins. Co. of Am.</u>, 890 F. Supp. 2d 390, 395-396 (S.D.N.Y. Aug. 28, 2012) (noting that <u>Pettaway</u> failed to address <u>Amara</u>).

Significantly, LINA makes no effort to address the implication of <u>Amara</u> even though <u>Amara</u> clearly diminishes the continuing validity of both <u>Pettaway</u> and another case cited by LINA, <u>Raybourne v. Cigna Life Ins. Co. of N.Y.</u>, 576 F.3d 444, 449 (7th Cir. 2009). Indeed, several courts have recognized that <u>Amara</u> precludes LINA's attempted reliance on <u>Raybourne</u>. <u>Barbu</u>, 987 F. Supp. 2d at 287; <u>Pettit</u>, 2016 U.S. Dist. LEXIS 89327, *24-25; <u>Moran</u>, 2014 U.S. Dist. LEXIS 119844, *16-17. <u>Raybourne</u> is inapposite for another reason: the ACF in that case

was deemed a plan document because it was referred to in an SPD: "[T]he Cigna SPD refers to the Claim Fiduciary Appointment and explains the discretion that it confers." In the cases that declined to follow Raybourne, as in this case, no SPD made mention of the ACF document. Barbu, 987 F. Supp. 2d at 287; Pettit, 2016 U.S. Dist. LEXIS 89327, *22-23; Moran, 2014 U.S. Dist. LEXIS 119844, *16-17; Francis, 2011 U.S. Dist. LEXIS 103924, *9-10. These courts further distinguished Raybourne on the ground that it did not appear to involve a contract with an "entire contract" integration clause and specific requirements regarding amendments being endorsed on or attached to the contract. The Group Policy in this case has such an integration clause, and for this reason, too, Raybourne is inapposite.

LINA concludes its argument regarding discretion by citing Moore v. Life Ins. Co. of N. America, 2018 U.S. Dist. LEXIS 48313 (W.D. Va. Mar. 23, 2018). That decision, however, relies exclusively on Raybourne, which is inapposite for the reasons set forth above. Moreover, Moore does not address a number of the distinguishing factors outlined in the other cases, such as the presence of an integration clause, the absence of specific language in the SPD referencing the ACF, the failure to provide the plan participant with a copy of the ACF despite requests for all plan documents. Moore, therefore, cannot be relied on to contravene the sound reasoning of the Barbu, Moran, Pettit, James, Gonda, Francis, and Heim cases.

In this case, the language of the Group Policy, Amendments and ACF thus establish that the ACF was **not** expressly incorporated into the plan. In addition, the ACF was never provided to Ms. Thoma, despite repeated requests. (PFF9-11.) LINA is thus estopped from relying on the ACF. Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc., 813 F.3d 420, 429 (1st Cir. 2016) ("Any terms that concern the relationship between the claims administrator and the beneficiaries cannot be held against the beneficiaries where, as here, the terms appear in a

financing arrangement between the employer and the claims administrator that was never seasonably disseminated to the beneficiaries against whom enforcement is sought"). Separate from estoppel, the failure to provide the ACF underscores that it is not a plan document because (1) ERISA requires that all plan documents be provided to plan participants; and (2) the terms of the Group Policy specifically required any amendment to be "endorsed on or attached to the Policy." Given these requirements, LINA's failure to provide the ACF to Ms. Thoma (or to attach or endorse it on the Group Policy when responding to requests for plan documents), necessarily implies that neither LINA nor Fox viewed the ACF as a plan document. Thus, in Silverman, the Second Circuit Court of Appeals determined that a CBA was not a plan document, in part, because it was not subject to ERISA's requirements regarding policy contracts and SPDs: "These two documents must be made available by the plan administrator 'for examination by any plan participant or beneficiary," or, "[i]n other words, the documents that lay out the plan terms must be readily accessible in written form to all covered employees." 761 F.3d at 287. Similarly, in Barbu, 987 F. Supp. 2d 286 FN3 and 288 FN4, the court deemed it significant to its holding that the ACF was not a plan document that the "[p]laintiff did not receive the ACF until discovery, despite earlier requests for [her] entire claim file."

As set forth in Ms. Thoma's moving papers, *de novo* review is also compelled because (1) California Insurance Code §10110.6 precludes LINA's use of discretionary language in group policies covering California residents, and there can be no question that the Group Policy covers numerous California residents of Fox's many California-based businesses and offices (ACWDecl 8-14; Thoma-Mem. 5.); and (2) LINA violated ERISA's procedural regulations by failing to consider the Alberigi VE Report or the SSA Disability Determination Explanation and

by refusing to produce SIU Claim Referral forms and applicable internal policies (Thoma-Mem. 5-6, 20, 24; ACWDecl 19(b) and (c); PFF37-38, 44, 53, 82-85, 97.).

Because the ACF is inadequate to vest LINA with discretionary authority, LINA's motion for summary judgment, predicated entirely on the application of that standard of review, must be denied. At a bench trial on the administrative record, judged *de novo*, Ms. Thoma has established by a preponderance of the evidence – including treating and consulting physicians' opinions, the objective medical evidence of her spinal condition, her vocational report, her social security award, her subjective symptoms, and peer-reviewed medical literature underscoring the consistency between Ms. Thoma's objective medical findings and her subjective complaints – that she is disabled under the terms of the Fox LTD Plan. (Thoma-Mem. 6-11; PFF20-85.) To the extent the Court treats the parties' cross-motions as motions for formal summary judgment, LINA's motion should be denied (and Ms. Thoma's granted) because Ms. Thoma has clearly established that LINA's evidence is not merely disputed, but is in fact outweighed by the substantial, overwhelming and far more credible evidence of disability she has presented in the administrative record.

## II. EVEN ON DEFERENTIAL REVIEW, LINA'S DECISION TO TERMINATE MS. THOMA'S CLAIM WAS UNREASONABLE, ARBITRARY AND CAPRICIOUS.

### A. The Court Must Consider LINA's Conflict of Interest as a Factor.

Because LINA's decision-making here was inherently conflicted, as an insurance company making decisions about its own financial liability, and more importantly, because that conflict actually manifested itself in LINA's sharp investigative practices and its arbitrary decisional process, LINA's termination of Ms. Thoma's benefits is entitled to significantly reduced deference. (Thoma-Mem. 11-15, 20-21.) The actions described in Ms. Thoma's motion papers, namely, LINA's withholding of relevant documentation (including the ACF, to the extent

it is deemed a plan document), its failure to consider Ms. Thoma's vocational evidence (the

Alberigi VE Report, its supporting documentation, and the SSA Disability Determination

Explanation), its aggressive and pretextual surveillance efforts, its inadequate efforts to timely

obtain Ms. Thoma's SSA file, and closing both its initial claim investigation and appeal level

review prematurely (without receipt of responsive medical and vocational evidence which it

knew Ms. Thoma intended to submit), confirm its one-sided approach.  (*Id.*)  LINA's motion

papers only confirm that its deliberative process was closed to any information other than its

own.  There is no discussion of the Alberigi report, of SSA's disability determination (which its

own vendor obtained), of the surveillance stills documenting Ms. Thoma's postural imbalance,

or even of LINA's prior medical and vocational disability determinations (on which it paid Ms.

Thoma 2 years of benefits).  LINA makes no effort to "review … the quality and quantity of the

medical evidence and the opinions on both sides of the issues," but simply adopts the opinions of

its own consultants without consideration of the evidence submitted by Ms. Thoma.  <u>McDonald</u>

<u>v. Western-Southern Life Ins. Co.</u>, 347 F.3d 161, 172-173 (6th Cir. 2003)  It didn't matter what

Ms. Thoma would submit as evidence because LINA's mind, relying solely on its own

consultants' opinions, was already set.  <u>Levitian v. Sun Life & Health Ins. Co.</u>, 486 Fed. Appx.

136, 140 (2d Cir. 2012) ("[A] conflict should be viewed as more determinative where the

Administrator relies upon one report, favoring the Administrator's position, more heavily than –

or to the exclusion of – another report favoring the benefits claimant"); <u>Lemon v. E. A. Miller,</u>

<u>Inc.</u>, 2005 U.S. Dist. LEXIS 32539, *28 (D. Utah Apr. 18, 2005) ("Defendant's rush to denial

demonstrates a serious conflict of interest and an unwillingness to 'get to the truth'").

**B.** **Deferential Review Does Not Sanction LINA's Dismissal of Ms. Thoma's Treating Physicians' Opinions and her Substantiated Pain Symptoms.**

LINA improperly views deferential review as *carte blanche* to ignore Ms. Thoma's evidence, citing <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 832-34 (2003).  <u>Nord</u>, however, prohibits only "routine deference" which "automatically ... accord[s] special weight to the opinions of a treating physician."  538 U.S. at 832.  Indeed, the Court observed that "the assumption that the opinions of a treating physician warrant greater credit ... may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks."  *Id.*  By implication, "greater credit" may be warranted where the treating physician does have superior expertise or a long-standing relationship with the claimant.  *See*, *e.g.*, <u>Shaw v. At&T Umbrella Benefit Plan No. 1</u>, 795 F.3d 538, 548-549 (6th Cir. 2015) (Claim administrator acted unreasonably where, *inter alia*, "[i]nstead of offering evidence to contradict [treating physician's] residual-functional-capacity questionnaire's conclusions, the Plan's physician advisors simply ignored the questionnaire and concluded that Shaw could perform sedentary work"); <u>Hunter v. Life Ins. Co. of No. America</u>, 437 Fed. Appx. 372, 379 (6th Cir. 2011)  (Peer consultant's failure "to address and refute these [treating physicians'] opinions … diminishes the strength of [his] conclusions").  LINA nowhere assessed the relative weight that should be accorded the opinions of Drs. Grattan and Berman, relative to treating physicians Vessa and Valenza, and consulting physician Dr. Implicito – given the specific relevant expertise favoring Ms. Thoma's physicians, the long-term treatment relationship she had with those physicians, and the consistency of those opinions relative to the inconsistencies and flaws in LINA's retained consultants.  (Thoma Mem. 15-16, 21-23; PFF86-94, 105-22; Counter-56.1 31, 44, 49-66.)

LINA cannot justify its failure to grapple with Ms. Thoma's evidence based on Tuttle v. Std. Ins. Co., 459 F. Supp. 2d 1063, 1070 (W.D. Wash. 2006) or Maniatty v. Unumprovident Corp., 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002). The former held only that a claim administrator need not defer to a treating physician's opinion when it is "unsubstantiated and conclusory." The detailed letters from Drs. Vessa and Valenza cannot reasonably be characterized as unsubstantiated and conclusory. (PFF65, 78, 80-81, 102-03.) Moreover, those opinions are based on assessments of Ms. Thoma as a patient over (collectively) 16 years (PFF27, 68.), a lengthy history of invasive spinal surgery, extensive spinal instrumentation and fusing, and ongoing objective clinical findings, including: abnormal MRI/X-Ray/CT findings (pseudarthrosis, cervical straightening, and persistent scoliosis); sagittal imbalance; abnormal/antalgic gait; greater trochanter hip tenderness; spinal tenderness and reduced flexibility; lower extremity/lumbar muscle stiffness, weakness, and other abnormalities; and significant ongoing pain interventions (including PT, opioid pain medication, and epidural steroid injections). (PFF60.) Many of these findings are documented in peer-reviewed medical literature to be associated with severe, persistent pain. (PFF30-31, 61-63.) In contrast, there was minimal objective evidence in Maniatty: "[T]he only objective evidence … regarding plaintiff's allegedly continuing back pain is an MRI that showed a 'small recurrent disc herniation,'" "[a]ll subsequent tests designed to uncover neurological damage were negative," and "she did not take pain medication." 218 F. Supp. 2d at 503-504.

Ms. Thoma's pain does not occur in the absence of relevant objective evidence. Except for Dr. Berman, all physicians who examined Ms. Thoma or reviewed her medical records concluded that she had significant, relevant objective findings. Dr. Garvey (LINA examiner – not mentioned by LINA in its papers) found that Ms. Thoma had "mild tenderness and

mild/minimal spasm over cervical region bilaterally," antalgic gait, and "[p]hysical examination showed objective evidence of her shifting in the chair during the approximate one-hour of sitting during the history taking." (AR678.) Dr. Grattan (LINA paper review consultant) also acknowledged the following findings: antalgic gait, alteration of spinal kinesiology, non-dermatomal numbness in the left upper extremity, reduced deep tendon reflexes. (AR1792.) Other findings were noted in the records, but not specifically acknowledged by Dr. Grattan, including pseudarthrosis at T8/T9 (AR1796.), disc protrusion at T2-T3 (AR1796.), and tenderness over the right greater trochanter and anterior capsule on the right side (AR1798.). A consultative examination performed for SSA found similar finding on physical examination, including tender greater trochanter bilaterally, mild tenderness along the thoracic and lumbar spine, and decreased lower extremity strength (4/5). (AR2027.)

Consequently, Ms. Thoma's disabling pain has a strong foundation in the objective medical record. Even LINA's examiners concede such findings and that Ms. Thoma likely suffers pain. (Dr. Garvey, PFF79; Dr. Grattan, PFF114-15.) The question is whether Ms. Thoma's complaints of severe pain are credible. No one has asserted she is non-credible or a malingerer. Moreover, she has submitted peer reviewed literature corroborating her physicians' opinions and establishing a clear relationship between the findings, conditions and diagnoses established by her medical record and severe pain of the kind she describes.

In contrast, LINA has based its refusal to credit Ms. Thoma's pain on the non-credible opinion of Dr. Berman (whose physical examination – alone in all the AR – found *no* abnormal findings and *no* restrictions or limitations), and the conclusory paper-review opinion of Dr. Grattan, who cites selected normal (and abnormal) findings, but then sets forth his own restrictions and limitations *ipse dixit*, without any reference to Ms. Thoma's subjective reports,

peer-reviewed medical literature, or any other rationale to explain how the particular medical findings he has selected are logically related to determining Ms. Thoma's level of pain, or the appropriateness of his chosen restrictions and limitations. LINA's emphasis on its surveillance is also unavailing, not least because the surveillance fails to establish Ms. Thoma's capacity for regular, full-time work. Indeed, the surveillance provides further objective evidence of her sagittal imbalance and antalgic gait. Moreover, LINA's reliance on the surveillance in this lawsuit (after it was ignored in Dr. Grattan's findings and went unmentioned in LINA's final decision letter), demonstrates the shifting, conflicted and improper nature of its reasoning. LINA's transferable skills analysis ("TSA") is arbitrary and unreliable because based solely on Dr. Grattan's opinion and failed to consider the expert vocational evidence and SSA documentation submitted by Ms. Thoma on appeal.

Under these circumstances, Tuttle and Maniatty are clearly inapposite. Cases where claim administrators were found to have arbitrarily rejected objective evidence consistent with the claimants' reported pain provide more apt precedent. Zuke v. Am. Airlines, Inc., 644 Fed. Appx. 649, 654-655 (6th Cir. 2016) ("[T]he Plan's conclusion that there was no objective evidence directly contradicts the record: Zuke's cervical and lumbar MRIs indicate 'fairly extensive degenerative disc disease' and a 'new disc herniation,' Zuke's positive Spurling test results indicate radicular pain, and finally, the record contains a physician's notes on the reduced range of motion over the right shoulder"; "[W]hen a plan categorically states that there is no objective evidence when in fact there is such evidence – favorable or not – the plan acts arbitrarily and capriciously"); Hunter, 437 F. Appx. at 378 (LINA improperly relied on its own physician consultants where they "summarily conclude that Hunter's complaints of pain and limited functionality 'are not supported' by the medical evidence," since no "doctor disputes the

nature or extent of Hunter's numerous joint and spinal conditions"). <u>Schully v. Continental Cas.</u>

<u>Co.</u>, 380 Fed. Appx. 437, 439 (5th Cir. 2010) (where "Hartford … failed to consider Schully's

longstanding subjective complaints of pain, which were repeatedly corroborated by the

physicians most familiar with his condition and which were consistent with the medical

evidence"); <u>Lee v. Bellsouth Telecomms., Inc.</u>, 318 Fed. Appx. 829, 838-39 (11th Cir. 2009)

(where MRIs, CT scans and other tests established an underlying medical condition – cervical

disc degeneration – and because there is "no laboratory dipstick test to diagnose chronic pain

syndrome" it was "arbitrary and capricious for BellSouth to deny Lee's SD Plan benefits claim

on the ground that she failed to provide objective evidence of her chronic pain syndrome," where

there was "nothing in the SD Plan excluding from its coverage pain-related disabilities…").

     **C.**    **Dr. Berman's Opinion Contains Manifest Flaws, and LINA's Unquestioning**
                **Acceptance of that Opinion was Arbitrary and Capricious.**

       LINA's summation of the consultative medical examination report by Dr. Arnold Berman

suffers from the same flaws as the report itself.  LINA quotes Dr. Berman's physical

examination findings, recites his conclusion that Ms. Thoma is not disabled, and then asks the

Court to treat this as "substantial evidence" (LINA-Mem. 8-11; LINA-56.1 30-46.) – without in

any way addressing the glaring inconsistencies in Dr. Berman's report, his relative lack of

expertise, evidence of his financial self-interest, the lack of explanatory rationale, and his failure

to meaningfully address evidence other than his own purported physical examination findings.

(Thoma-Mem. 15-17; PFF86-95.)  Indeed, it is surprising to see LINA rely so heavily on Dr.

Berman's opinion in its motion papers to support its final appeal determination, since its appeal

level medical consultant, Dr. Grattan, cited none of Dr. Berman's findings or conclusions

(PFF109.), the appeal level TSA was based exclusively on Dr. Grattan's opinion (PFF122.), and

LINA's final appeal denial letter cited only Dr. Grattan's opinion (Dr. Berman's opinion is not

mentioned at all) (Counter-56.1 88, 90; PFF125.).  Indeed, although plaintiff's pre-termination correspondence and her appeal included a detailed critique of Dr. Berman's expertise, financial motivation, findings and opinion (PFF49; Counter-56.1 86.), none of this information was addressed by either Dr. Grattan or LINA.  In light of LINA's apparent abandonment of Dr. Berman's opinion at the final appeal level determination, its resuscitation of that opinion in its motion papers (without having ever addressed its inadequacies, either in the appeal decision or in its motion papers), like its similar handling of the surveillance evidence (*see* Argument II-E.), reflects its self-interested claim handling and constitutes an abuse of discretion.

**D.**     **Dr. Grattan's Opinion is Not Substantial Evidence to Support LINA's Termination of Disability Benefits.**

As with Dr. Berman's report, LINA's motion papers simply recite Dr. Grattan's findings and conclusions (LINA Mem. 11-14.), without any effort to address the flaws, discrepancies, and lacunae of that opinion.  (PFF58, 105-22; Thoma-Mem. 21-23.)  Although LINA now seeks to bolster Dr. Grattan's opinion by reciting Dr. Berman's opinion and the surveillance evidence at great length, Dr. Grattan did not rely on this evidence, himself, to support his conclusions. LINA's appeal decision, similarly, did not recite or rely on either Dr. Berman's opinion or the surveillance evidence as grounds for justifying its decision to terminate Ms. Thoma's benefits. (*See* Argument II-C, and II-E.)  Rather, LINA adopted the last piece of evidence it solicited – Dr. Grattan's opinion – and then based its TSA solely on that opinion.  (PFF105, 122, 124-25; Counter-56.1 90; Thoma-Mem. 21-24.)  These are the only two pieces of evidence recited in LINA's appeal denial letter.  (*Id.*)  And, as in the final appeal denial letter, LINA's motion papers make no effort to address the considerable evidence and arguments which Ms. Thoma submitted on her appeal for its review.  (Counter-56.1 89.)  LINA's method for rendering appeal determinations, accepting its latest medical consultant's opinion to the exclusion of all other

evidence, is patently arbitrary and capricious. Johnson, at *40-41 (No "reasoned decision" where "LINA simply adopted the last piece of evidence to come in the door"; "[E]ven under the arbitrary-and-capricious standard, an ERISA plan administrator deserves 'less deference if [it] fails to gather or *examine* relevant evidence'").

> **E.     LINA's Surveillance Evidence Does Not Constitute Substantial Evidence Supporting its Decision to Terminate Ms. Thoma's Disability Benefits.**

LINA's reliance in its motion papers on the surveillance evidence (LINA-Mem. 14-19.) is misplaced because (i) this evidence was not part of its final appeal denial decision, (ii) LINA failed to address the arguments and information submitted on appeal by Ms. Thoma about the surveillance; and (iii) this evidence does not contradict Ms. Thoma's disability and, indeed, is provides additional objective evidence to corroborate her pain.  In its initial denial letter, LINA relied solely on three activities in the 2015 surveillance and on Dr. Berman's purported conclusion therefrom that "the … video did not indicate any cervical, thoracic, or lumbar spine functional loss" (PFF100; AR387; Counter-56.1 44.), while at the appeal level, Dr. Grattan attributed no significance to the surveillance and LINA's denial letter similarly did not discuss or rely on the surveillance at all.  (PFF110; Counter-56.1 84.)  Yet, LINA now devotes nearly 5 pages of its memorandum of law (12 paragraphs of its 56.1 Statement) to the 2015 surveillance, with additional focus on its 2014 surveillance, which factored into neither its initial termination or final appeal denial letters.  (LINA-Mem. 14-19; LINA-56.1 18-29.)  LINA's attempt to resuscitate the surveillance evidence is improper, particularly since it failed to address (either at the appeal stage or now) any of Ms. Thoma's facts and arguments regarding the surveillance. (Counter-56.1 84.)  Glenn v. MetLife, 461 F.3d 660, 672 (6th Cir. 2006) ("[T]he failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious"), *aff'd*, 554 U.S. 105 (2008).  Furthermore, LINA's shifting

approach to the surveillance is evidence of its conflict of interest.  Noone v. United of Omaha Life Ins. Co., 2016 U.S. Dist. LEXIS 97472, *37 (D. Ore. Jun. 16, 2016) ("The administrator's shifting basis for its final denial between the final denial letter and the briefing in this case suggests an abuse of discretion"); Collins v. Liberty Life Assur. Co., 988 F. Supp. 2d 1105, 1129-1130 (C.D. Cal. Dec. 11, 2013) (where "Liberty's rationale for the denial has changed throughout the different stages of appeal and litigation," this "provide[s] some evidence that it desired a certain result and summoned up various rationales to reach it," which" contravenes the purpose of ERISA and is the essence of an abuse of an insurance provider's discretion").

Even if its reliance on the surveillance evidence were proper, LINA's characterization of the surveillance as providing "substantial evidence" supporting its decision is erroneous.  The surveillance evidence does not withstand scrutiny.  LINA's new and expansive description of the surveillance is riddled with numerous errors, omissions, and improperly broad insinuations – exhaustively cataloged in Ms. Thoma's Rule 56.1 Counter-Statement.  (Counter-56.1 18-29.) Many of these errors concern details, but it is in these details that LINA's consistent skewing of the evidence can be seen.  In the aggregate, these distortions serve to portray Ms. Thoma as more active than she is, and never the other way around, *e.g.*:

- 06-23-2014:  LINA characterizes Ms. Thoma as walking a dog nearly twice as much time (LINA-Mem. 14; LINA-56.1 18.) than she actually did.  (Counter-56.1 18.);

- 06-23-2014:  In its memorandum of law (but not its proposed facts), LINA characterizes Ms. Thoma as walking with "no visible signs of pain or restriction" (LINA-Mem. 15.), but, as Ms. Thoma pointed out to LINA during the appeal (and it has never refuted), she walks with a distinctly choppy, abnormal, antalgic gait, and her stance generally displays a forward-tilted posture characteristic of sagittal imbalance and flatback syndrome. (Counter-56.1 18, 83-84.)

- 06-25-2014:  LINA reports the time that Ms. Thoma left her residence by car, at 8:07AM (LINA-Mem. 15; LINA-56.1 21.), but does not report that the total duration of her driving that day (the only activity noted) was 23 minutes.  (Counter-56.1 21.)

- 06-27-2014: LINA reports that Ms. Thoma "ushered" and "assisted" children out of child car safety seats (LINA-Mem. 15; LINA-56.1 23.), but the surveillance agent said nothing about "assisting the children," or the presence of "child safety seats," nor is there footage to corroborate this assertion. (Counter-56.1 23.) Child safety seats are not mentioned when they later return to the car, nor does LINA note that Ms. Thoma entered her car "butt first" – an accommodation to her back stiffness and pain. (*Id.*)

- 10-20-2014: LINA reports that "[a]fter returning home [from a Quiznos], [Ms. Thoma] retrieved her letter from her mailbox, entered her residence and left in 17 minutes to go to a UPS Store." (LINA-Mem. 16; LINA-56.1 24.) In fact, Ms. Thoma remained inside her residence for 1 hour and 28 minutes before leaving for the UPS Store, though she left her house once during this time to get her mail. (Counter-56.1 24.)

- 06-30-2015: LINA states that Ms. Thoma left her home at 9:10AM, implying that she drove her car thereafter for some indefinite period of time. (LINA-Mem. 17; LINA-56.1 27.) In fact, the surveillance report describes (and the surveillance film reveals) that 9:10AM was the time Ms. Thoma arrived back at her home, driven by her husband, from an early morning spinal epidural injection for pain relief. (Counter-56.1 27.)

- 07-01-2015 and 07-02-2015: LINA states that Ms. Thoma engaged in what it characterizes as a "full forward bend." (LINA-Mem. 18-19; LINA-56.1 28-29.) This is not how the surveillance reports characterize Ms. Thoma's bending, and the footage and stills demonstrate that she employs adaptive strategies (bending from a lower stair, supporting her back) and a rigid posture, when bending. (Counter-56.1 28-29.)

This list is not exhaustive. It is emblematic of LINA's over-reaching use of the surveillance, which was undertaken on a pretextual basis in the first place (Thoma-Mem. 13-14.), and underscores how thoroughly LINA's conflict of interest infects its assessment of the evidence.

LINA also arrives at sweeping conclusions unjustified by the very limited activity its agents observed. It itemizes activities from the surveillance (LINA-Mem. 14-19.) and then sweepingly asserts that these activities demonstrate that Ms. Thoma is able to "lead a busy and active life," "she engages in activities that keep her on the go and out of her house for significant periods of time," "she displays no limitations due to the effect of medications she is taking," "she is seen sitting and standing without making any pain related adjustments or positional changes for long periods of time, and "she is able to participate in occasional rough housing with her young children." (LINA-Mem. 19.) Ms. Thoma has discussed how this evidence does not show

what is relevant for the matter at hand – sustained work capacity sufficient to generate earnings in excess of $100,000 per year. (Thoma-Mem. 18-20.)

With regard to the 2015 Surveillance (which was the only surveillance ever specifically mentioned in LINA's termination and appeal denial letters), Ms. Thoma notes that they depict little more than 2 hours of activity each day (total 6) for the 3 days she was surveilled (24 hours):

- 06-30-2015: After arriving from her epidural steroid injection at 9:10AM, Ms. Thoma is active/outside for a grand total of approximately 51 minutes: sitting (reclined in a padded rocking chair) for 1 minute, 23 minutes, and 11 minutes (with standing/walking breaks of 6 minutes, 1 minute, and 1 minute, respectively (between 9:10 and 1:04PM); several brief appearances on the porch (2 minutes at 3:04PM, 1 minute at 3:10PM, and 6 minutes at 3:36PM, after which she was inactive/inside for the remainder of the day. (Counter-56.1 27.)

- 07-01-2015: Ms. Thoma was "active" for approximately 2 hours. This included retrieving her mail (1 minute), several local drives of 18, 8, 33, 12, and 16 minutes (separated, respectively, by 2.5 hours in her home, 8 minutes of standing/walking at ball field, 43 minutes at a medical office, 30-35 minutes at home, and 2.5 hours on a chaise lounge chair at a pool. (Counter-56.1 28.)

- 07-02-2015: Ms. Thoma was active approximately 2 hours and 10 minutes. This occurred exclusively in the period between 8:45AM and 12:45PM and consisted of tying her son's shoes and walking to her car (3 minutes). This was followed by local car drives of 25, 22, 10, 12, 4 and 5 minutes duration (separated, respectively, by 20 minutes at home, 67 minutes at a psychotherapy appointment, 10 minutes at a Panera's Bakery, 12 minutes home, and 49 minutes standing, walking and milling around at a baseball field). Ms. Thoma then remained at home for the rest of the day (4.5 hours) broken up by two appearances on her porch (once to lightly sweep) lasting no more than 3 minutes total. (Counter-56,1 29.)

As Ms. Thoma, Dr. Vessa and Dr. Valenza all report, the surveillance is most notable for depicting Ms. Thoma keeping up with her medical appointments and being a mother and attendant to her children. She engages in local drives of brief duration, typically separated by periods of rest (or alternated standing/walking). The one occasion during which she is seen sitting for any length of time, she takes several breaks, is sitting on a padded rocking chair, and is frequently semi-reclined with her legs up to take the stress off her back. These activities are all

generally consistent with Ms. Thoma's reported restrictions and limitations, and all are performed at her current level of opioid pain medication.  (Counter-56.1, 75-82.)

The surveillance is also notable for what it does not show.  Although Ms. Thoma was an avid biker, swimmer, runner, and skier (AR1201 [10-14-2015 C. Thoma Letter]; AR1211 [10-12-2015 R. Thoma Letter].), she is not depicted using any of her ample free time in these (or other exercise) activities, nor is she shown engaging her children in any sporting/game activity (although they themselves seem active/involved in sports).  Ms. Thoma is depicted eating solely at fast-food restaurants (Quiznos, McDonald's, Panera's Bakery) and for only short durations (typically, taking out to her home, instead), rather than taking leisurely lunches at sit-down restaurants.  (Counter-56.1 18-29.)  She is not seen attending cinemas, theaters, or other seated entertainment venues.  (*Id.*)  Ms. Thoma reports that she is "not terribly productive in the evenings, and I do not generally plan any activities away from home during the evening, if I can avoid it."  (AR1986-87 [11-06-2016 C. Thoma Letter].)  LINA and its surveillance agents appear to have taken Ms. Thoma at her word, as surveillance was rarely conducted into the early evening (*e.g.* AR2242 [06-26-2014 Surveillance, discontinued at 8PM after Ms. Thoma was continuously inactive from 3PM to 8PM].), and was on a number of occasions terminated much earlier "due to the lack of further activity," suggesting the agents did not want to substantiate all her hours of non-activity.  (*E.g.*, AR2241 [06-25-2014 Surveillance, discontinued at 3PM after Ms. Thoma was inactive since 8:30AM]; AR2261 [10-21-2014 Surveillance, discontinued at 4PM after Ms. Thoma was inactive from 12:24PM]; AR2264 [10-22-2014 Surveillance, discontinued at 4:15PM after Ms. Thoma was inactive from 1:35PM].)  LINA ludicrously characterizes these minimal activities as evidencing a "busy," "active," and "on the go" lifestyle. Nowhere does it explain how the ability to perform two hours of activity a day reasonably

demonstrates that Ms. Thoma is capable of regular, full-time work sufficient to generate income in excess of $100,000 per year.

Finally, LINA has failed to address the significant evidence in the surveillance that corroborates Ms. Thoma's disability. After Ms. Thoma documented evidence of antalgic gait and abnormal posture (including stills) in her appeal, LINA dropped its reliance on the surveillance in its appeal denial letter. (Counter-56.1 83-84.) Although it now resurrects its reliance on the surveillance, the fact remains that the surveillance contradicts LINA's assertion that Ms. Thoma displays no pain-related adjustments or effects of her pain-medication. She is seen: (i) massaging her back on several occasions; (ii) backing into her car "butt first" on multiple occasions; (iii) assuming the standing posture, with flexed knee and hip, of a patient with sagittal imbalance and flatback syndrome; (iv) walking with an antalgic gait; (v) bending adaptively from a lower stair; (vi) sitting only in padded car seats for short duration and, in one longer instance, in a padded rocking chair that she takes advantage of to sit in a semi-reclined position; (vii) being inactive most afternoons into the early evening (which she has described as required by her cumulative pain and medication side-effects); and (viii) attending doctor's appointments, including one on June 30, 2015, from which she returns looking particularly slow and bent-over. (Counter-56.1 18-29.) Indeed, her activities on July 1st and 2nd must be viewed in the context of the June 30th epidural pain-relief injection. (Counter-56.1 82.) Finally, LINA's assertion that Ms. Thoma is shown engaging in "occasional rough housing" is little more than puffery. Tossing towels to her children hardly constitutes "violence or rough boisterous play,"[5] and, in any event, does not demonstrate work capacity. (Counter-56.1 28.)

---

[5] Meriam-Webster online dictionary, available at *https://www.merriam-webster.com/ dictionary/roughhouse*.

**F.    LINA's Appeal TSA Cannot Constitute Substantial Evidence to Support its Decision to Terminate Ms. Thoma's Disability Claim.**

LINA's moving papers confirm that the only medical evidence or opinion considered in preparing the Appeal TSA was Dr. Grattan's peer consultant report.  (LINA-56.1 68; LINA-Mem. 21.)  LINA also confirms that neither the Alberigi Vocational Evaluation Report of SSA's Disability Determination Explanation were provided to its consultant in her preparation of the TSA.  Consequently, the integrity and validity of the Appeal TSA is eviscerated.  Of note, the Appeal TSA, by not considering Mr. Alberigi's report, carried over a significant failing of the TSA relied upon to terminate Ms. Thoma's disability claim:  it identified "Executive Producer, Promos" as an appropriate position for Ms. Thoma even though she has no training or background in the marketing industry.  (Counter-56.1 74; PFF84; Thoma-Mem. 18.)

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests judgment denying LINA's motion, granting Ms. Thoma's motion, overturning LINA's termination of benefits, reinstating her claim, and awarding her disability benefits under the Plan retroactive to May 13, 2016, with interest, and her reasonable attorneys' fees.

Dated:  New York, New York
      June 18, 2018

Respectfully submitted,

_____
A. CHRISTOPHER WIEBER, ESQ. (ACW-2077)
Law Office of Mark Scherzer
Attorney for Plaintiff
49 Nassau Street, Fourth Floor
New York, New York 10038
Tel: (212) 406-9606
Email:  markscherzerlaw@verizon.net

*Of Counsel:*
*Mark Scherzer, Esq.*
*A. Christopher Wieber, Esq.*