UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

CHRISTINE THOMA,

                    Plaintiff,                    17 Civ. 4389

        -against-                                 OPINION

THE FOX LONG TERM DISABILITY PLAN                 AND ORDER
AND THE LIFE INSURANCE COMPANY OF
NORTH AMERICA,

                    Defendants.

----------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        LAW OFFICE OF MARK SCHERZER
        29 John Street, Suite #1103
        New York, NY 10038
        By:  Albert C. Wieber, Esq.


        Attorneys for Defendants

        RUSSO & TONER LLP
        33 Whitehall Street, 16th Floor
        New York, NY 10004
        B:   Kevin G. Horbatiuk, Esq.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2 11 18

**Sweet, D.J.**

The plaintiff, Christine Thoma ("Thoma" or "Plaintiff"), has moved for judgment on the administrative record. The defendants, The Fox Long Term Disability Plan (the "Plan") and Life Insurance Company of North America ("LINA") (collectively, the "Defendants"), have also moved for judgment on the administrative record.

Based upon the facts and conclusions set forth below, the motion of Thoma is granted, and the motion of the Defendants is denied.

## I.    Prior Proceedings

Thoma filed a claim under the Plan for Long Term Disability ("LTD") benefits due to chronic pain as a result of a history of multiple spinal surgeries. Thoma's incur date for her long term disability claim was October 10, 2013. Her application was approved for benefits that commenced on April 8, 2014. Thoma was paid LTD benefits until May 13, 2016. During that period of time, the disability definition changed from a "Regular Occupation" definition to an "any occupation" definition.

LINA advised Thoma that after reviewing her claim for continuing LTD benefits, LINA was unable to continue paying LTD benefits beyond May 13, 2016. LINA's initial adverse benefit determination resulted from an Independent Medical Examination ("IME") conducted by an orthopedic surgeon.

Thoma submitted an administrative appeal regarding LINA's initial adverse benefit determination. During her appeal, a Board Certified Specialist in Physical Medicine & Rehabilitation, Dr. Howard L. Grattan ("Dr. Grattan"), provided LINA a summary and review of Thoma's medical records. Dr. Grattan acknowledged that Thoma had functional impairments due to her prior history of spinal surgery but opined that she was not restricted from all work activity. LINA issued its final adverse benefit determination on January 27, 2017.

Thoma commenced the instant action on June 9, 2017 alleging violations of ERISA, 29 U.S.C. §§ 1001 et seq. The parties instituted motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and executed a written consent, pursuant to *O'Hara v. Nat'l Union Fire Ins. Co.*, 642 F.3d 110 (2d Cir. 2011), to a bench trial on the parties' submissions with the District Court.

The motions were heard and marked fully submitted on June 20, 2018.

## II.   The Applicable Standard

Although courts often treat motions for judgment on the administrative record as motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the court may instead treat such a motion as requesting "a bench trial on the papers[,] with the District Court acting as the finder of fact." *See O'Hara*, 642 F.3d at 116 (citation and quotation marks omitted). In the latter scenario, "it must be clear that the parties consent to a bench trial on the parties' submissions" and the district court must "make explicit findings of fact and conclusions of law explaining the reasons for its decision." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (citing Fed. R. Civ. P. 52(a)). Here, the parties have executed a written consent to a bench trial on their submissions. *See* Horbatiuk Decl. Ex. C. The findings of fact and conclusions of law are accordingly set forth below.[1]

## III. Findings of Fact

---

[1]     To the extent a finding of fact includes a conclusion of law, it is deemed a conclusion of law, and vice versa.

The facts are set forth in Plaintiff's Rule 56.1
Statement of Facts, Defendants' Counter Rule 56.1 Statement of
Facts, Defendants' Local Rule 56.1 Statement of Facts, and
Plaintiff's Counter Rule 56.1 Statement of Facts. Unless
otherwise indicated, Plaintiff has proven the facts set forth
below by a preponderance of the evidence.

1.      Thoma was employed as a Senior Producer by Fox
News Channel and Fox Business Network ("Fox News") at the time
she went out on disability. *See* Compl. ¶21; Ans. ¶21; AR930-31
[Thoma Resume]; AR327 [ACCLAIM Notes, "Employer Information" and
"Job Title"].

2.      Fox News is located in New York City, and Thoma
was employed by Fox News in New York. *See* Compl. ¶6; Ans. ¶6;
AR327 ["Employer Information"]; AR930-31 [Thoma Resume]; AR802
[04-24-2014 Notification of Ineligibility for N.J. State
Temporary Disability Benefits]; AR874 [Fox News Senior Producer
Job Description].

3.      Fox Entertainment Group Inc. ("Fox") established
and maintained a Group Long Term Disability Income Plan (the
"LTD Plan") for its employees and the employees of its

4

subsidiary and affiliate companies. *See* AR16 [Group Policy];
AR18-19 [Group Policy Classes of Participants]; AR22-15 [Group
Policy Amendments, adding and/or revising Classes of
Participants].

4.    LINA is a corporation engaged in the business of
issuing and administering policies of group long term disability
insurance. *See* AR1386 [Regulatory Settlement Agreement, ¶1].

5.    The LTD Plan's coverage is provided through a
Group Policy No. VDT-980008 (the "Group Policy"), issued by
LINA. *See* Compl. ¶13; Ans. ¶13; AR16 et seq. [Group Policy];
AR2-15 [Group Policy Amendments].

6.    Thoma was a covered participant in the Plan. *See*
Compl. ¶16; Ans. ¶16.

7.    The LTD Plan is an "employee welfare benefit
plan" subject to ERISA and is subject to enforcement under
ERISA. *See* Compl. ¶10; Ans. ¶10.

8.    Prior to the time Thoma went out on disability,
she requested the operative LTD Plan documentation and was
provided by Fox, the Plan administrator, with a copy of the

Group Policy (AR16-48) and several of the amendments (AR2-16).
*See* A. Christopher Wieber Decl. ("ACW Decl.") ¶¶ 1-2.

9.     Subsequently, during the administration of her
claim, Thoma made three separate requests for operative plan
documents - including specific requests (on two occasions) for
any documents which LINA believed conferred it discretionary
authority. *See* ACW Decl. Ex. 3 at 3; AR1752. On each occasion,
LINA provided only the Group Policy and several amendments. *See*
ACW Decl. ¶¶3-6; AR941-47 [03-06-2015 Counsel AR Request
Letter]; AR4612 [03-31-2015 LINA Response Letter]; ACW Decl. Ex.
3 [05-24-2016 Counsel AR Request Letter]; AR391-95 [06-30-2016
LINA AR Response Letter]; AR1749-57 [02-02-2017 Counsel AR
Request Letter]; AR369 [LINA AR Response Letter].

10.     At no time did either Fox News or LINA provide
Thoma with the Appointment of Claim Fiduciary ("ACF," at AR1).
*See* ACW Decl. ¶6.

11.     The Group Policy nowhere contains language
conferring discretionary authority on LINA, nor incorporating or
endorsing the ACF. *See* AR16-48.

6

12. The Group Policy states that "[t]he entire contract will be made up of the Policy, the application of the Employer, a copy of which is attached to the Policy, and the applications, if any, of the Insureds." AR39. Moreover, it states that "[n]o change in the Policy will be valid until approved by an executive officer of the Insurance Company" and "[t]his approval must be endorsed on, or attached to, the Policy." *See* AR40.

13. The ACF is not designated as an amendment, endorsement, or attachment to the Group Policy, nor does it contain language attaching, annexing, or otherwise incorporating itself into the Group Policy. *See* AR1. The ACF contains precatory language that "authorizes the issuance of appropriate amendments to any Policies to reflect this appointment and the authority and responsibility granted to the Claim Fiduciary." *Id.*

14. Amendments to the Group Policy produced by LINA are marked as such. *See* AR2-16.

15. At the time LINA terminated Thoma's claim, the Group Policy provided that Thoma (as a Class 1 Participant, *see* AR275) is disabled if she is (1) "unable to perform the material

7

duties of any occupation for which … she is, or may reasonably become, qualified based on education, training or experience" and (2) "unable to earn 60% or more of ... her Indexed Earnings." *See* AR20.

16. At the time Thoma went out on disability, her monthly earnings were $13,906.85. *See* AR54, 495, 888, 2017. At the time her benefits were terminated, LINA calculated her indexed monthly earnings to be $14,004.20. *See* AR1056 [01-25-2016 LINA Transferable Skills Analysis]. LINA thus calculated the 60% "wage requirement" as $8,402.52/month, or $100,830.24/year. *Id.*

17. Shortly after graduating from Rutgers University with a B.A. in Communications, Thoma started work as a Page at NBC in 1987. *See* AR922 [10-14-2015 C. Thoma Letter]. She remained at NBC for 13 years and was promoted to news writer in 1988/89 (at age 24, the youngest to hold that position at that time), to segment producer, and, ultimately, to field producer (during the period between 1992 and 2000). *Id. See also* AR930-31 [C. Thoma Resume]; AR216-19 [06-26-2014 SSA Work History Report].

18.     In May 2000, Thoma was hired by Fox News as a
line producer and, within a few years, she was promoted to
Senior Producer. *Id.* In that capacity, she ultimately oversaw
"all editorial, production, and control room duties for daytime
and primetime shows" and produced "breaking news, business news,
crime stories, politics and general news coverage." *Id.* During
her time at Fox, she was Senior Producer for such programs as
*Fox & Friends*, *On the Record with Greta Van Susteren*, and
*Dayside with Linda Vester*. *Id.* With several short interruptions
(to work on a documentary in 2007, and to provide election
coverage from October to November 2011), Thoma continued to work
as a Senior Producer for Fox until her condition forced her to
stop working in October 2013. *Id.*

19.     Thoma expressed pride and a sense of
accomplishment in her career:

> I am extraordinarily proud of my career in
> television production. I worked in the industry
> for 26 years, a woman in a male-dominated field,
> starting with a page position at NBC, and
> attaining one of the highest rungs in the
> business, as a senior producer on nationally
> prominent TV shows on Fox. I am a news-aholic and
> media-junky. I loved working in this field, and
> would happily return to work if it were at all
> possible.

AR922 [10-14-2015 C. Thoma Letter].

20. Thoma met her husband, Rich Thoma, at Fox News in 2001. *See* AR938 [10-12-2015 R. Thoma Letter]. Mr. Thoma attested that she "was in charge of (2) hours of programming on the weekend," "was very much a leader whom the talent and control room crew respected," and "she loved her job and was promoted several times over her Fox career." *Id.*

21. Dr. Vessa, who has treated Thoma for over 10 years, corroborated Thoma's dedication, writing that "I have no doubt from what she reported to me that she very much enjoyed her career," and observing that "[s]he and her husband did the same kind of work and I think that formed a bond between them." *See* AR1174-75 [10-12-2015 Dr. Vessa Letter].

22. Thoma was diagnosed as a child with severe scoliosis. *See* AR922, 1248, 1761, 1853, 1983. Since the age of 14 (in 1979), Thoma has undergone a series of major surgeries to her back. AR727, 1540, 1759, 1853, 1983, 2026.

23. The first surgery, intended to correct her scoliosis, was the implantation of Harrington Rod instrumentation and a fusion from T4 to L4. *Id.* This surgery was a major procedure, during which "[t]he surgeon lays bone grafts

across the exposed surface of each vertebra" so that "[t]hese grafts will regenerate, grow into the bone, and fuse the vertebrae together." AR2153 et seq. In order "[t]o support the fusion of the vertebrae, the surgeon uses a steel rod, extending from the bottom to the top of the curve," which "is attached by hooks that are suspended from pegs inserted into the bone." *Id.* The "steel rod is jacked up and then locked into place to support the spine securely." *Id.* Recovery is prolonged and difficult, as "patients must wear a full body cast and lie in bed for 3-6 months until fusion is complete enough to stabilize the spine." *Id.* In Thoma's case, she was placed in a body cast for nine months. *See* AR1983-84.

24. While the Harrington Rod fusion procedure was considered "gold standard" treatment for scoliosis in 1979, by the mid-1980s it was being replaced by other instrumentation procedures – such as the Luque Rod, the Luque-Harrington Rod, the Cotrel-Dubousset, and the Texas Scottish-Rite Hospital procedures – because of the documented inadequacies and failures associated with the Harrington Rod fusion procedure. AR2165. *See also* AR590 et seq. In particular, the following relevant shortcomings have been well-reported in the medical literature:

- **Substantial Probability of Developing Flat-Back Syndrome:** "About 40% of Harrington patients have a condition called the flat back syndrome, because the procedure eliminates normal lordosis (the inward curving of the lower back).... In later years, however, the disks may collapse below the fusion, making it difficult to stand erect, and the condition can cause significant pain and emotional distress." *See* AR2165. *See also* AR590("Unfortunately, the use of distraction as the sole correction tool resulted in the loss of normal sagittal plane alignment" and "[t]he loss of normal lumbar lordosis was associated with 'flat back syndrome'"); AR974, M.O. Lagrone, "Treatment of Symptomatic Flatback After Spinal Fusion," 70 J. Bone Joint Surg. Am. 569-80, Apr. 1988 ("The previous use of distraction instrumentation with a hook placed at the level of the lower lumbar spine or the sacrum was the factor that was most frequently identified as leading to the development of the flatback syndrome"); AR1214 et seq., at 1215-16, B.S. Lonner, "FAQs About Flatback Syndrome," downloaded from SpineUniverse, Sept. 2015 ("Patients treated with Harrington rods often did very well for years or even decades. Their spine could compensate for the 'flattening' of lordosis with normal discs below the fusion. Eventually, as the discs below the fusion wore out (degenerated), the individual lost the ability to stand upright and developed pain"); AR2182 et seq., at 2183, Wheeless' Textbook of Orthopaedics, "Harrington Instrumentation," 2012 ("Reduced lumbar lordosis – 'flatback' deformity – can develop over time.")

- **Increased Incidence of Pain Associated with Flat-Back Syndrome and Lumbar Rod Fixation:** "Iatrogenic loss of lordosis is now frequently recognized as a complication following placement of thoracolumbar instrumentation, especially with distraction instrumentation. Flat-back syndrome is characterized by forward inclination of the trunk, inability to stand upright, and back pain.... The most common cause of the deformity includes the use of distraction instrumentation in the lumbar spine and pseudarthrosis." *See* AR961 et seq., at 961, G.C. Wiggins, et al., "Management of Iatrogenic Flat-Back Syndrome," 15 Neurosur. Focus 1-9, 2003. *See also* AR2182, Wheeless' – "Harrington Instrumentation," ("Lower level of arthrodesis in lumbar curves should

12

not extend to lower lumbar region unless it is absolutely necessary; avoid arthrodesis to L-5 & L-4, if possible; [with] lower level of arthrodesis, there is more back pain"); AR2215 et seq., at 2215, V. Sarvahi, et al., "Characterization of Gait Function in Patients with Post-Surgical Sagittal (Flatback) Deformity: A Prospective Study of 21 Patients," 27 Spine 2328-37, Nov. 2002 ("Patients with flatback develop several compensatory mechanisms. The goal of the compensation is to maintain an efficient gait and decrease joint damage, but these safeguards fail over time. Flatback not only causes backache, abnormal posture, and abnormal body mechanics but also compromises the stability of gait and taxes the knee and hip joints adversely"); AR957, "FAQs About Flatback Syndrome," ("The main symptoms are difficulty standing upright with low back and often thigh and groin pain. The patient's symptoms typically will worsen as the day progresses with a sense of fatigue and increasing difficulty in the ability to achieve erect posture. Patients flex or bend their hips and knees to allow them to obtain an upright position. This is often exhausting as the day progresses. Some patients also have symptoms of sciatica and spinal stenosis with leg pain and weakness exacerbated by walking. Some individuals will have neck and upper back pain as they strain to align themselves. These symptoms often become disabling, requiring narcotic medications, and limiting the individual's ability to perform routine daily activities."); AR2184 et seq., at 2184, K.J. Paonessa, et al., "Back Pain and Disability After Harrington Rod Fusion to the Lumbar Spine for Scoliosis," 17 Spine, Supp. 8, 249-53, Aug. 1992 ("The study group had a higher rate of secondary surgeries for complications or late disc disease below the fusion, a higher back pain score, more difficulties with normal daily activities, needed more regular pain medications, and had more episodes of back pain"); AR2192 et seq., at 2192, 2196, B.K. Potter, et al., "Current Concepts Review: Prevention and Management of Iatrogenic Flatback Deformity," 86 J. Bone Joint Surg. 1793-1808, Aug. 2004 ("The etiology of flatback syndrome may be multifactorial, but the most common cause is iatrogenic loss of lumbar lordosis secondary to Harrington distraction instrumentation"); *id.* ("At the time of a ten-year follow-up, Cochran et al. noted subjacent

13

retrolisthesis in fifteen (63%) of twenty four patients with a fusion to L4 or L5; all fifteen had low-back pain, and eleven had degenerative changes.")

- **Increased Incidence of Degeneration Above/Below Fusion Levels:** "The essential problem in fusion, despite its frequent success, is that the lost mobility of the fused segment places additional stresses on adjacent levels of the vertebral column. The consequence is an increased likelihood of degenerative changes, ligamentous instability, and even fracture at levels adjacent to a successful fusion construct." *See* AR558 et seq., at 567, P.M. Young, et al., "Complications of Spinal Instrumentation," 27 RadioGraphics 775, May-June 2007. *See also* AR2189 et seq., at 2190, G. Ghiselli, et al., "Adjacent Segment Degeneration in the Lumbar Spine," 86 J. Bone Joint Surg. Am., 1497-1503, Jul. 2004 (After posterior lumbar spine fusion, "[t]he rate of symptomatic degeneration at an adjacent segment warranting either decompression or arthrodesis was predicted to be 16.5% at five years and 36.1% at ten years.")

- **Revision Surgery for Flat-Back Syndrome Has a Low Complete Success Rate:** "If revision surgery for FBSS [Failed Back Surgery Syndrome] is technically challenging and may be associated with high risk of complications ... and lower clinical outcomes, revision surgery in patients treated more than 20 years before with spinal fusion and Harrington Rod stabilization for adolescent scoliosis is even more challenging." AR2170 et seq., at 2172-73. *See also* M.A. Marino, "Two Cases of Failed Back Surgery Syndrome After Correction and Stabilization Surgery for Scoliosis with Harrington Instrumentation," 87 Acta Biomed Supp. 1, 112-115, 2016 ("In a retrospective study, Cho et al revealed 34.4% of serious complications in patients who had a surgical multilevel revision operation for spinal deformity, with a negative impact on clinical outcomes" and "Glassman et al described a perioperative complication rate of 62% in revision spine surgery performed after previous operations for scoliosis."); AR2174 et seq., at 2174, H. Elgafy, et al., "Rationale of Revision Lumbar Spine Surgery," 2 Global Spine J. 7, 2012 ("Revision lumbar spine surgeries are technically challenging with inconstant outcome results"); AR 974,

14

"Treatment of Symptomatic Flatback After Spinal Fusion," (after revision surgery, "47 per cent ... continued to lean forward and ... 36 per cent ... continued to have moderate or severe back pain," and "[t]he failure to restore sagittal plane balance led to a higher rate of pseudarthrosis, which was associated with recurrent deformity"); AR2205, "Current Concepts Review," ("The management of iatrogenic flatback syndrome is difficult and complex, with a high rate of operative morbidity.")

25.   Within several years of her surgery, it was apparent that Thoma's Harrington rod instrumentation broke and that she was suffering from a painful fusion failure, *i.e.*, a pseudarthrosis, at the L3 level. AR1759, 1867, 1984. She underwent two additional surgeries to correct this L3 pseudarthrosis—first in 1982 (at age 17), and again in 1990 (at age 26), with the insertion of two smaller rods, after the first surgery proved unsuccessful. AR1540, 1984. Even so, Thoma endured increasing pain as she grew older and her spine suffered the wear and tear of the altered biomechanics – and flatback syndrome – resulting from her fusion. AR1983-93. Major revision surgery was recommended as early as 2002, but Thoma wished to exhaust conservative treatment. AR1984. By 2011 (at age 46), her pain had become so persistent that she felt compelled to undergo the flatback revision surgery. AR358, 365, 861, 1624, 1984-85. In addition to the surgical attempt to restore some lordosis to her lumbar region, it was determined that she should undergo

additional fusion (down to the S-1 level) due to adjacent

degenerative changes she suffered at levels below her prior

fusion. *Id.* While the revision surgery provided some relief,

this was incomplete and (as in the past) Thoma's pain gradually

returned. *See* AR1178-86, 1983-93. A further pseudarthrosis, at

T8-T9 was identified in 2013. AR1623, 1627, 1759. Additionally,

Thoma developed painful degenerative changes in her cervical

spine, for which she ultimately underwent a cervical fusion at

C5 to C7, in 2013. AR843-46, 1178-86, 1983-93. The cervical

fusion provided incomplete relief and, on top of the ongoing

pain associated with her failed back syndrome (which

additionally included associated hip pain and tenderness), Thoma

recognized that it was no longer possible for her to work. *Id.*

26.    Thoma took a short-term disability ("STD") leave

starting April 23, 2011, in relation to the flatback revision

surgery she underwent at that time. AR349, 358, 363. LINA

approved her for STD benefits through October 1, 2011, the date

on which her physicians approved her for return to work. AR333-

68, at 344, 348, 478, 479-80.

27.    On October 10, 2013, to accommodate her cervical

fusion, Thoma commenced another STD leave. AR304-32 at AR327.

Thoma found herself unable to return to work and was obliged to

transition to LTD Plan benefits, which became effective on April
8, 2014, after the Plan's 180-day "elimination period." AR21,
51.

28.     Throughout the first two years of her LTD claim,
LINA repeatedly approved Thoma for "own occupation" benefits.
Among the factors cited by LINA's lay and medical examiners
were: (1) her self-reported pain, (2) her ongoing spinal
misalignment, (3) her potent opiate pain management regimen, (4)
the accumulated surgical insult to her spine, and (5) her gait
disturbance (as observed on clinical examination and on LINA's
surveillance film):

- **03-19-2014: Claim Strategy:** "S/s [subjective symptoms]
  - chronic back/neck pain, chronic cramping/spasms,
  cannot sit for longer than 40 min, numbness in arms,
  nerve pain throughout. Tx [treatment] plan - meds-
  oxycodone, lyrica, hydrocodone and valium . . . . Per
  NCM [Nurse Case Manager] staffing - Based on available
  medical info, physical functional impairment is
  supported from ID [Initial Disability Date] forward as
  evidence lordosis and cont to do chin exercises xrays
  showed fusion. Per DOT cx has light occ . . . .
  Reasonable to approve claim and f/u in 2 months for
  updated meds." AR275-770.

- **06-10-2014: NCM Review (Orozco):** "R&Ls [restrictions
  and limitations] are supported for another 3 - 4 mos
  as evidenced by customer hx [history] of multiple
  spinal fusion surgeries in past, most recent ACDF
  10/10/13 with residual ongoing chronic pain managed by
  pain mgt with multiple opiate and other medications.
  Pain management notes document antalgic gait." AR249-
  51.

17

- **12-28-2014 Dr. Garvey Independent Medical Evaluation ("IME"):** "[S]he is cautious with walking, has a mildly antalgic gait, and does hold her back in a straightened position . . . . I do believe that Thoma may experience pain in the cervical, thoracic, lumbar and hip regions . . . . Due to the narcotic and mind altering medications, I would limit her from performing Safety Sensitive work duties." AR672-79, at 679.

- **01-26-2015 Exploratory Transferable Skill Assessment ("ETSA"):** Karen Franz, MS, CRC, CCM – reviews Garvey IME results then states: "Based on the employer provided job description for Senior Producer, the following DOT was identified DOT 159.117-010 Producer. The occupation is performed at the light physical demand level. The claimant's restrictions are not consistent with the required physical demands of her occupation." AR209-10.

- **02-11-2015 Claim Strategy:** "TDOO [Totally Disabled Own Occupation] – Cx [Claimant] underwent IME on 12/28/14 and based on OO analysis RLs [restrictions and limitations] provided are not consistent with cx own occ." AR200-01.

- **03-13-2015 LINA Telephone Note of Communication to Thoma:** "Cx [claimant] is being provided benefits as it is understood, per policy, she cannot work OO [own occupation] or at her previous functional level." AR194.

29.   Based on its assessment of her LTD Claim, LINA made a lump sum settlement offer on March 5, 2015, *see* AR197, 463-66, reflecting its belief that her condition was not anticipated to improve throughout the remainder of the "own occupation" period (i.e., through April 8, 2016), but that she would remain disabled for the entire next year.

18

30. At the time of this offer, LINA had undertaken two rounds of surveillance, from June 24, 2014, through June 27, 2014, AR751-73, and from October 20, 2014, through October 22, 2014, AR686-704, and Allsup – its designated vendor for pursuing Social Security disability ("SSD") benefits – was actively pursuing Thoma's disability claim with the Social Security Administration.

31. The SIU/Surveillance Claim Referral dated May 6, 2014, which initiated the first two rounds of surveillance, listed three "Red Flags" as the basis for conducting surveillance: "Claimant May Be Working: ... ☐ No SSDI" and "Doctor/Medical Doc Issues: ... ☐ Excessive Limitations" and "☐ Continued Extensions." AR2225-26; AR2291-92. Contrary to the "No SSDI" notation, Thoma was already working with LINA's designated SSD vendor Allsup to secure SSDI. *See* AR264, 268. Moreover, SSA requires a claimant to be disabled for "five full calendar months." AR543 [SSA Notice of Award]. There was no documentation of "continued extensions" noted anywhere in LINA's ACCLAIM notes. LINA's final SIU Report asserted that in addition to these three "red flags," the claim examiner reported two additional "red flags," including "extended recovery period" and "cannot provide a PAA." AR751 [07-08-2014 Surveillance Report]. However, there is no ACCLAIM notation that LINA viewed Thoma's

19

recovery as "excessive" or "extended" at that time, and there were internal medical approvals of her disability before and after the claim referral. LINA had just referred her to its SSA vendor on the presumption that her disability would continue. Dr. Vessa returned a Physical Ability Assessment ("PAA") form on May 20, 2014. AR792-93 [05-20-2014 Vessa PAA]; AR259 [ACCLAIM Note] ("5/22/2014 - Received OVN and PAA.").

32. Despite two specific requests, *see* ACW Decl. Ex. 3 and AR1749-57, LINA did not produce the SIU/Surveillance Claim Referral prior to Plaintiff's discovery requests in this litigation.

33. On April 25, 2014, LINA arranged for its designated Social Security representative, Allsup, to press Thoma's claim for SSD benefits before the SSA. AR264, 268. On May 29, 2014, Allsup accessed and copied Thoma's medical records from LINA's file. ACW Decl., ¶17 & Ex. 14.

34. LINA required Thoma to pursue SSD benefits by requiring her to sign a Reimbursement Agreement that allowed it to reduce her LTD Plan disability benefits by an estimated amount of her SSD benefits if she did not proactively apply for

such benefits. AR806 [04-03-2014 Reimbursement Agreement]; AR33 [Group Policy – "Assumed Receipt of Benefits"].

35.    Although SSA initially denied Thoma's claim, *see* AR2047 [SSA Claim File], Allsup filed an appeal and benefits were ultimately approved and paid by Notice of Award, dated April 27, 2015, *see* AR185 [ACCLAIM Notes], AR1075-78 [04-27-2015 SSA Notice of Award]. Allsup immediately notified LINA of the approval on or about May 6, 2015. AR1074. LINA then calculated and collected a retroactive overpayment from Thoma's SSD benefits in the amount of $49,881.00, recovered on June 15, 2015, and instituted a reduction in the monthly benefit amount it paid to Thoma from $8,344.00 to $4,507, after deducting for the primary and dependent benefits payable to Thoma. AR57, 185, 1068-74.

36.    Vocational consultant Victor Alberigi ("Alberigi") reviewed and evaluated SSA's claim file, in light of his experience in Social Security disability proceedings, and noted the following:

- "[A]n SSA medical consultant . . . concluded that 'based on the available evidence the orthopedic impairment is severe and very limiting....'"

- SSA concluded that "one or more of [Thoma's] medically determinable impairments can be expected to produce her pain and other symptoms,"

and that Thoma's "statements about the intensity,
persistence, and functionally limiting effects of
the symptoms [are] substantiated by the objective
medical evidence alone."

- "[B]ased on the updated medical records obtained
  for SSA's reconsideration of Thoma's claim, the
  medical consultant (Wallace Wells, M.D.),
  reported that 'claimant's claims are credible.'"

- "SSA reported that Thoma's total Residual
  Functional Capacity was 'Less than Sedentary' due
  to the alternate sitting/ standing every 15
  minutes and limitation to never stoop, which
  significantly erodes the sedentary occupational
  base.'"

- SSA's decision reflected its determination that
  Thoma was "continuously disabled under Social
  Security's rules from 10/9/13 through 4/21/15"
  and that its assignment of an "MIP 3 indicates
  that SSA does not plan to review Thoma's medical
  evidence until 03-01-2018 because cessation of
  disability, as defined by SSA, is
  unlikely/improbable during the intervening 3-year
  interval."

- SSA's decision reflects its determination that
  Thoma is incapable of "substantial gainful
  activity, "which SSA defines as the ability to
  generate monthly income of at least $1,040, in
  2013; $1,070, in 2014; … $1,090, in 2015, and in
  2016, $1,130."

- "Social Security does not appear to have applied
  any special rules due to advanced age, lack of
  education, or past work experience."

- "SSA concluded that a full evaluation of past
  relevant work, and potential transferable skills,
  could be expedited because of this substantial
  diminution in Thoma's sedentary work capacity."

AR2054 et seq., at 2056, 2062.

22

37.    Within several weeks after Allsup notified LINA
that Thoma had been awarded SSD benefits, LINA initiated
surveillance via a "Claim Referral" to its Special
Investigations Unit ("SIU"). AR2291-92 [06-01-2015
SIU/Surveillance Claim Referral; *see also* AR180 (indicating that
a Follow-up Task was created on 05-21-2015 to "f/u [follow up]
on SIU.")


38.    LINA listed two "Red Flags" as the basis for
conducting surveillance: "Claimant May Be Working: ...
☑ Allegation Phoned In" and "Doctor/Medical Doc Issues: ... ☑ No
Objective Testing by Doctor." AR2291-92. No third-party
allegation of purported work by Thoma is reported anywhere in
LINA's claim notes, though Thoma reported to LINA that she was
potentially interested in writing or blogging as an alternate
work activity. *See* AR263 (noting that "Cx [claimant] says she …
is now looking into writing as this would allow her to lay down
in b/w [between] writing" and that "Cx is interested in RTW
[return to work] in a different field, as mentioned earlier
maybe in writing"). The final SIU Report asserts that the Claim
Manager reported two new red flags – "Extended Recovery Period"
and "Continued Extensions" – in addition to "No Objective
Testing by Doctor." AR610. The "phoned in allegation" is dropped

23

from this list. Neither of the new red flags are documented
anywhere in the claim notes.

39. LINA made no effort to obtain Thoma's SSD claim
file until March 1, 2016, nearly 10 months after it was first
advised of SSA's disability determination. AR404-05.

40. Under the terms of the 2013 Regulatory Settlement
Agreement (the "RSA"), AR1386, et seq., entered into after an
audit of LINA's Glendale CA Office, from January 1, 2009,
through December 31, 2010, LINA agreed to institute procedures
whereby "the Company will make a reasonable effort . . . to
obtain SSA records" and will give the SSD award "significant
weight," meaning "that the SSA records relating to the SSDI
award are reviewed and consideration of the SSA's judgment that
a claimant is disabled for [Social Security disability Income
(SSDI)] purposes will generally be an essential element of the
Disability evaluation under the governing Disability contract."
AR1401, RSA, Ex. B. LINA agreed to these procedures as a
consequence of the California Department of Insurance Report of
the Targeted Market Conduct Examination of the Claims Practices
of Life Insurance Company of North America ("the Market Conduct
Report"), adopted June 4, 2012, *see* AR1419 et seq., which cited
LINA for its "failure to obtain, consider or reconcile the

complete Social Security Disability Income (SSDI) records
relating to an award of SSDI benefits." AR1425. Similar findings
were made by the Massachusetts and Maine Departments of
Insurance. AR1443 et seq., at 1450; AR1458 et seq., at 1465.

41.     These same obligations to obtain SSA claim file
records and to give them significant weight are also reflected
in LINA's internal policies and procedures.[2] *See, e.g.*, AR2311
[LINA Policy: "Social Security Awards and Disability
Determinations"] ("The Company will make a reasonable effort,
consistent with all applicable SSA regulations, manuals; and
guidelines, to obtain SSA records"); *id.* ("Affording significant
weight to a SSDI award means that the SSA records related to the
SSDI award are reviewed and consideration of the SSA's judgment
that a claimant is disabled for SSDI purposes will generally be
an essential element of the Disability evaluation under the
governing Disability contract.")

42.     After receiving its surveillance report, *see*
AR610 et seq., LINA requested (and Thoma provided) updated
medical and disability information. LINA asserted that "if there
is no medical information available to gather to clarify

---

[2]     Although LINA disputes that its internal policies are part of the AR,
they are part of the AR under ERISA's procedural regulations. *See* Part IV.2,
*infra.*

25

functionality, [it would] scheduling [Thoma] for an Independent

Medical Evaluation" ("IME") (AR449-50.) Thoma then provided

responses on September 17, 2015, AR1532-1611, and October 14,

2015, AR1612-83. On or about October 8, 2015, LINA initiated an

IME, despite the fact that it had already received Thoma's

September 17th submission and was anticipating her October 14th

submission. *See* AR123 (listing IME "Vendor Referred Date" as 10-

08-2015). *See also* 1684 et seq., at 1685.

43.    Thoma raised several concerns regarding the

proposed IME examiner, Dr. Arnold Berman, including:

- Dr. Berman's treatment and research focus was on hip
  replacements, knee replacements, and ankle surgeries.
  AR1686, AR1740-46.

- Dr. Berman had at least 10 malpractice lawsuits filed
  against him in one five-year period. AR1686, AR1727-
  33, AR1736-39.

- Dr. Berman filed two false biennial registrations – in
  2002 and 2004 – that failed to report the malpractice
  actions listed above, resulting in a public censure
  and fine by the Pennsylvania Board of Medicine.
  AR1735-39.

- LINA provided Dr. Berman with incomplete records.
  AR905-08, AR1051-54, AR1082-83.

Despite these concerns, LINA elected to proceed with

Dr. Berman as the IME examiner. At the appeal stage, Thoma

identified additional concerns regarding Dr. Berman, AR1844-46, including:

- Doctor Berman operates Comprehensive Medical Associates, LLC, which is organized solely for the purpose of performing external medical reviews. AR1475-77, 1478. Dr. Berman generates annual revenue of $802,381 from this business alone, which does not include Dr. Berman's income from medical examinations performed directly through other companies (such as MES Solutions) and insurers. AR1478.

- Patient reviews included a sizeable number of extremely negative evaluations, resulting in a score of 1.5 out of 5. AR1483-91.

44. Upon receipt of Dr. Berman's IME report, LINA conducted a transferable skills analysis ("TSA") that considered Dr. Berman's opinion to the exclusion of all other medical evidence in LINA's possession. AR121, AR1056-57.

45. Thoma had specifically requested and understood that she was being provided an opportunity to review and respond to Dr. Berman's report. ACW Decl Ex. 3 [05-24-2016 Counsel's Letter Objecting to Rushed Decision and Requesting AR], at 1-2. *See also* AR1107-11 [10-22-2015 Counsel's Letter]; AR1082-83 [12-17-2015 Counsel's Letter]; AR1051-54 [01-06-2016 Counsel's Letter]; AR906-08 [02-09-2016 Counsel's Letter]. She advised LINA that responses would be provided by her treating physicians

on or before May 20, 2016. AR1500-02 [04-01-2016 Counsel's
Letter]; AR1494-95 [04-14-2016 Counsel's Letter].

46.   Based exclusively on Dr. Berman's IME report, the
2015 Surveillance, and the TSA – and without having received the
SSA claim file it had requested or the responses from Thoma's
treating physicians – LINA terminated Thoma's claim, by letter
dated May 13, 2016. AR386-89; ACW Decl. Ex. 3 [05-24-2016
Counsel's Letter Objecting to Rushed Decision and Requesting
AR].

47.   By letter dated November 8, 2016, Thoma appealed
LINA's claim termination. AR1810-48. Thoma's appeal included:

- Records and letters from Paul Vessa, M.D. (Orthopedic
  Surgery), including:

  - Detailed examination report, dated September 27,
    2016 (AR1849-52);

  - Narrative letter, dated May 13, 2016, intended as
    a pre-decision response to the report of LINA's
    external consultant Dr. Berman (AR1853-55);

  - Dr. Vessa's medical chart from March, 2014, to
    the present (AR1856-1933);

  - Dr. Vessa's medical credentials (AR1934-42);

- Records and letter from Joseph Valenza, M.D. (Pain
  Medicine), including:

- Letter, dated April 11, 2016, intended as a pre-decision response to the report of LINA's external consultant Dr. Berman (AR1943);

- Updated treatment records from Dr. Valenza (AR1944-61);

- Dr. Valenza's medical credentials (AR1962-71);

- A Physical Ability Assessment completed by consulting physician Dante Implicito (Orthopedic Surgery), together with Dr. Implicito's medical credentials (AR1972-82);

- Letter of Christine Thoma, dated November 7, 2016 (AR1983-93);

- Social Security Administration disability claim file documentation for Thoma, including (AR1994):

- 07-21-2014 Richard Thoma Questionnaire (AR1995-2002);

- 09-21-2014 Psychiatric Consultative Examination, Dr. Khoshnu (AR2004-07);

- 10-01-2014 Christine Thoma Claimant Questionnaire and Work History Report (AR2010-25.);

- 03-19-2015 Orthopedic Consultative Examination & X-rays, Dr. Vehknis (AR2026-33);

- 04-21-2015 SSA Disability Determination Explanation (AR2034-49);

- 04-27-2015 SSD Award Notice (AR2050-53);

- Vocational Evaluation report of Alberigi, CRC, LPC, LSW, CDMS, ABVE-A, dated September 20, 2016, together with a copy of Alberigi's resume (AR2054-80);

- Supplemental vocational and medical information referenced by Alberigi in his report (AR2081-2152);

- Additional medical articles regarding Thoma's medical condition, surgical procedures, and treatment outcomes (AR2053-2224);

- Still-frame color images taken from LINA surveillance film (with straight lines marked in red to highlight Thoma's postural imbalance) (AR2340-59);

- The California Department of Insurance Report of The Targeted Market Conduct Examination of the Claims Practices of Life Insurance Company of North America, adopted June 4, 2012 (AR1384-1473); and

- Supplemental information regarding Dr. Arnold Berman (AR1474-91).

48.    In a cover letter to the appeal, also dated November 8, 2016, Thoma specifically requested (1) "a reasonable opportunity to review and respond to any supplemental medical review obtained ... on appeal"; and (2) that all appeal level communications (including those between LINA's medical consultants and Thoma's physicians) be conducted in writing and with notice to counsel. AR1808-09. By letter dated December 2, 2016, Thoma again requested a reasonable opportunity to review and respond to any new medical opinion obtained by LINA during the appeal stage. AR1805-06.

49.    On or about December 23, 2016, Thoma's counsel learned that LINA's medical consultant, Dr. Grattan, had failed to comply with the request for written communications (with

notice to counsel's office) and had attempted to contact Thoma's physicians directly, via telephone. ACW Decl. Exs. 15-17. Dr. Grattan subsequently complied and provided written questions for Thoma's treating physicians. *Id.*

50.  On January 10, 2017, in response to these specific questions posed by the peer review consultant retained by LINA for the appeal, Thoma submitted responses from her treating physicians.[3] AR1758. Those submissions included:

- Dr. Vessa Letter, dated January 4, 2017 (AR1759-60);
- Dr. Valenza Letter, dated January 9, 2017 (AR1761-62.).

51. By letter dated January 19, 2017, LINA explained that its peer consultant medical report had been completed and already forwarded to LINA's vocational consultant for preparation of a transferable skills analysis. AR376. In response, Thoma wrote a third time, on January 20, 2017, to request that she be given a reasonable opportunity to review and respond to the new medical report. ACW Decl. Ex. 17.

---

[3]     This correspondence is excluded from LINA's production of the Administrative Record, even though clearly "submitted, considered, or generated" with respect to Thoma's claim.

52. LINA denied Thoma's appeal, by letter dated January 27, 2017, based exclusively on Dr. Grattan's peer consultant report and the TSA which was based upon it. AR371-74. Thoma was not afforded an opportunity to review and respond to the peer consultant report, although LINA never affirmatively refused Thoma's request to do so. AR1749-57 [02-02-2017 Counsel's Post-Appeal AR Request and Protest Letter].

53. Thoma has had an extended history of major surgical interventions. As noted above, these have included a T4-to-L4 fusion with Harrington rod instrumentation (1979), two surgeries for correction of a resulting L3 pseudarthrosis (1982, 1990), spinal fusion revision and flatback correction surgery, extending her fusion to S1 (2011), and a C5-to-C7 fusion (2013).

54. After her surgical history, Thoma continued to exhibit significant, objectively-documented abnormalities which includes the following:

- **Sagittal Imbalance and Other Postural Abnormalities:** Despite the flatback revision surgery Thoma underwent in 2011, she still exhibits significant spinal misalignment. This includes:

- **Sagittal Imbalance:** See, e.g., 05-15-2015 Bridwell Recs, X-Ray: "There is approximately 5 cm of anterior sagittal imbalance. Minimal inferior left pelvic tilt is present." AR526. See also AR848 10-16-2013 Dr.

32

Vessa Chart Notation ("Her x-rays show that she does forward list her head.") This imbalance is also reflected on physical examination findings. *See, e.g.,* AR851, 855, 11-18-2013 and 12-02-2013 Excellent PT Records: on physical examination, "Forward Head/Rounded Shoulders; Moderate"; AR1868, 1880, 04-01-2015 and 04-22-2015 Excellent PT Records: on physical examination: "Flat back posture with rounded shoulders and protracted neck" and "strt [straight] back (fused), sl fwd [slight forward] head.") LINA's video surveillance documents Thoma's sagittal imbalance. As reflected in the still-frame images drawn from the surveillance, Thoma is frequently seen in a characteristic flatback posture, with her head and shoulders tilted forward relative to an alignment from her feet and hips. (AR2340, 2341, 2342, 2345, 2346, 2347, 2356, 2358, 2359.) On other occasions, particularly when standing for sustained periods, Thoma also demonstrates a compensatory posture, with her knees slightly flexed and pelvis also slightly pitched. (AR2351, 2352, 2353, 2354, 2355, 2357. *See also* AR957, "FAQs About Flatback Syndrome," supra: "Patients flex or bend their hips and knees to allow them to obtain an upright position"; AR975, K.J. Hamilton, et al., "Flat Back and Sagittal Plane Deformity," from Youmans Neurological Surgery, 6th Ed., Chapter 288, Elsevier-Saunders: Phila. 2011: "Forward inclination of the trunk ... and difficulty extending the knees when standing erect" produces a "sagittally imbalanced posture [that] results in the need for continual hip and knee flexion to maintain an upright stance"; AR1221, "Management of Iatrogenic Flat-Back Syndrome" ("Patients require first extension of the hips and then knee flexion and cervical extension to maintain horizontal gaze").

- **Post-Fusion Cervical Straightening:** See, e.g., 03-20-2015 SSA X-ray (AR1193.); 10-16-2013, 11-20-2013, 12-23-2013, 02-05-2014, and 02-29-2016 Cervical Spine X-Rays (AR849, 854, 858, 869, and 1923.); 03-25-2015 Vessa Chart Notation (AR1182.), Diagnostic impression: "kyphotic posture above the [cervical] fusion."

- **Persistent Scoliosis:** See, e.g., 03-20-2015 SSA X-ray (AR1194.): Lumbar: mild scoliosis with convexity towards the left; 04-24-2015 Vessa CT Thoracic Spine

(AR1191.): dextroscoliosis, apex centered at T8-T9; 04-24-2015 Vessa CT Lumbar Spine (AR1192.): Levoscoliosis with apex at L1-L2; 05-15-2015 Bridwell Recs, X-Ray (AR526.): "there is unchanged mild rotary S-shaped scoliosis of the thoracolumbar spine"; "There is unchanged mild kyphosis of the thoracolumbar junction and upper lumbar spine."

- **Abnormal Gait:** Thoma's gait has been repeatedly observed as abnormal. See, e.g., 11-11-2013, 12-09-2013, 03-07-2014, 04-04-2014, 05-30-2014, 06-27-2014, 07-25-2014, 08-29-2014, 10-19-2014, 10-24-2014, 11-21-2014, 12-19-2014, 01-16-2015, 02-13-2015, 03-09-2015, 03-30-2015, 04-27-2015, 05-29-2015, 06-29-2015, 08-03-2015, 08-31-2015, 10-05-2015, 01-18-2016, 02-15-2016, 03-14-2016, 04-11-2016, 05-13-2016, 06-10-2016, 07-11-2016, 08-15-2016, 09-12-2016 Kessler Rehab Notes (AR821, 819, 785, 783, 708, 710, 712, 714, 1140, 1139, 1137, 1133, 1131, 1129, 1704, 1702, 1700, 1698, 1696, 1694, 1692, 1690, 1945, 1947, 1949. 1951, 1953, 1955, 1957, 1959, 1961.): |gait and transfers described as "mildly" to "moderately" antalgic; 01-15-2014, 01-17-2014, 01-20-2014, 01-24-2014, 01-29-2014, 03-04-2014 Kessler Rehab Notes (AR748, 742, 739, 734, 728, 725.): abnormal gait pattern characterized as "arthrogenic: moderate (lack of hip extension on right)."

  - LINA's own video surveillance is perhaps the best evidence of Thoma's abnormal gait pattern. In addition to the trunk-forward inclination of her gait (as reflected on the still-frame images), when she is shown walking for any distance, her gait has a distinct, choppy flop-footedness that appears to be associated with slightly everted feet and never fully extending her knees. *See, e.g.*, 06-30-2015 Surveillance, Index 46:06 – 48:36. Two of LINA's designated physician, Dr. Karen Garvey and Dr. Howard Grattan, made similar findings. (12-28-2014 Dr. Garvey IME Report, AR672 et seq., at 678: "Review of surveillance video showed that she walked with a normal to mild antalgic gait"; 01-13-2017 Dr. Howard Grattan Peer Consultant Report, AR1783 et seq. at 1792: "She does have an antalgic

34

gait.") Abnormal gait is frequently present in patients with Flatback syndrome/sagittal imbalance. (AR2215 et. seq., V. Sarwahi, et al., "Characterization of Gait Function in Patients with Postsurgical Sagittal (Flatback) Deformity," 27 Spine 2328-37, 2002: "Velocity, step length, and stride length were all significantly decreased in the subject group"; "Patients had greater hip flexion" and, "[a]dditionally, the hip was rotated externally"; "Increased peak knee flexion ... and increased valgus [i.e., turning outward] were present during midstance").

- **Thoracic Pseudarthrosis:** 05-06-2015 Vessa Chart Notation. AR1181. Recent CAT scan of the thoracolumbar spine reveals a pseudarthrosis at T8-T9; 05-15-2015 Bridwell Chart Notation (AR1541) ("I talked to her and her husband quite a bit about the nonunion at T8-T9 [i.e., pseudarthrosis] and about the findings on the CT scan and plain films" and "I went back and looked over the note from 6/17/13 ..., [w]e talked about the nonunion in the mid thoracic spine then...."); 06-30-2015 Vessa Operative Report (AR1625) ("Using AP fluoroscopy ... we ... moved the camera up to the T9 region and identified the T9 pseudarthrosis, which was more visible on the patient's left than on the right.").

- **Greater Trochanter/Hip Pain:** 01-15-2014 Kessler Rehab Note (AR748.) Reporting that complaint of right hip pain was treated with cortisone injections in 08-2013 and 01-2014; 03-19-2015 SSA Vekhnis IME (AR2027.): on physical examination: tender greater trochanter bilaterally; 03-25-2015 Vessa Chart Notation (AR1182.): Left trochanteric tenderness to direct palpation, cortisone injection administered to left trochanteric; 04-22-2015, 04-24-2015, 04-27-2015, 04-29-2015, 05-01-2015, 05-04-2015 Excellent PT (AR1248, 1252, 1255, 1261, 1258, 1263.): "mod tender L lat hip esp area of trochanter"; 08-24-2016 Vessa Chart Notation (AR1931.): Trochanter injection; 09-27-2016 Vessa Physical Examination Report (AR1849-52.): "Pain right hip area," trochanteric tenderness over the right greater trochanter an anterior capsule on the right side, diagnosis of right trochanteric bursitis

35

with likely painful lumbosacral hardware, greater trochanter injection performed.

- **Degenerative Spine Changes:** 03-20-2015 SSA X-ray (AR1194.): Lumbar: mild degenerative disc findings are seen at all levels; 02-29-2016 Cervical MRI (AR1924-25.): left foraminal narrowing C4-C5, disk protrusion T2-T3; 03-07-16 Vessa Chart Notation (AR1928.): interpreting Xray and MRI: "There appears to be slight spondylolisthesis of C4 and C5 which does not move appreciably on flexionextension films. MRI scan does reveal the slight listhesis of C4 and C5 with resultant mild stenosis. There is also some foraminal stenosis at that level."

- **Spinal Tenderness and Reduced Spinal Flexibility:** 12-28-2014 Garvey IME (AR672 et seq., at 678.): physical examination of back: mild tenderness and mild/minimal spasm over cervical region bilaterally; 03-19-2015 SSA Vekhnis IME (AR2027): on physical exam of thoracic/lumbar spine: mild tenderness along the spine and cervical spine: range limited in all direction; 04-24-2015 CT Thoracic Spine (AR1191): T8-T9 area "is associated with marked degenerative disc disease"; 04-24-2015 CT Lumbar Spine (AR1192): "There are multilevel degenerative disc disease" and disc space narrowing "most severe at L5-S1"; 04-22-2015, 04-24-2015, 04-27-2015, 04-29-2015, 05-01-2015 Excellent PT (AR1249, 1252, 1255, 1261, 1259): gross ROM cervical: severely limited; lumbar: moderately limited; 09-27-2016 Vessa Physical Examination Report (AR1849-52.): ROM: Flexion, restricted; Extension, restricted; right lateral bend and left lateral bend, restricted; extension/rotation restricted; Tenderness: spinous process positive bilaterally. Lower Extremity/Lumbar Muscle Stiffness/Weakness7/Abnormalities: 01-15-7 Normal "full strength" is rated 5 (out of 5) and annotated "5/5." Anything less than that is considered a decrease from full strength, with "0" representing "no visible muscle contraction." E.g., G. Newman, M.D., Ph.D., "How to Assess Muscle Strength," Merck Manual (Feb. 2018), 2014 Kessler Rehab Note (AR748.): physical examination findings: Moderate restrictions piriformis and rectus femoris flexibility; 03-19-2015 SSA Vekhnis IME (AR2027): Lumbar spine muscle weakness 4/5; 03-25-2015 Vessa Chart Notation (AR1182): Hyperreflexic in lower extremities; 04-01-2015 Kessler

Rehab Note (AR1868): Lower extremity muscle testing ranges bilaterally from 3 to 4/5; 04-22-2015, 04-24-2015, 04-27-2015, 04-29-2015, 05-01-2015 Excellent PT (AR1248, 1252, 1255, 1261, 1258): muscle testing lower extremity ranges bilaterally from -4/5 to +4/5, Piriformis, Hamstrings, and Rectus Femoris flexibility all marked as moderate restrictions bilaterally, pain with wincing at Erector spinae, gluteus maximum, gluteus medius, hip external rotators, multifid, and piriformis, pain with withdrawal at coccyx and sacrum (left), with wincing on right; 09-27-2016 Vessa Physical Examination Report (AR1849-52): tenderness and spasm at lumbosacral junction, sciatic notch tenderness positive bilaterally.

- **Significant Pain Medication and Treatment:** Thoma has undergone multiple modes of pain treatment since 2013, including physical therapy, lidocaine/cortisone injections, and a daily cocktail of powerful pain medications. The latter have included: K1 cream, Valium 5 mg (1x day), Hydrocodone 7.5/325 (up to 2 day), Opana ER 10 mg every 12 hours, Lyrica 50 mg (3x day). (See, e.g., 11-21-2014, 12-19-2014, 01-16-2015, 02-13-2015, 03-09-2015, 03-30-2015, 04-27-2015, 05-29-2015, 06-29-2015, 08-03-2015, 08-31-2015, 10-05-2015, 11-23-2015, 12-09-2015, 01-18-2016, 02-15-2016, 03-14-2016, 04-11-2016, available at https://www.merckmanuals.com/professional/neurologic-disorders/neurologicexamination/how-to-assess-muscle-strength. 05-13-2016, 06-10-2016, 07-11-2016, 08-15-2016 Kessler Rehab Notes, AR1136, 1132, 1130, 1128, 1126, 1124, 1122, 1120, 1118, 1116, 1114, 1112, 1093, 1096, 1944, 1946, 1948, 1950, 1952, 1954, 1956, 1958, 1960, 09-12-2016; 03-19-2015 SSA Vekhnis IME, AR2026; 12-28-2014 Garvey IME, AR672 et seq., at 676; 12-16-2015 Berman IME, AR1060 et seq. at 1061.) In approximately November 2015, the muscle relaxant Amrix was added to Thoma's medication regimen, and in September 2016, her Hydrocodone dose was increased to 10/325 (up to 2 day). (Id.) Injections documented in the record include: 08-2013 (hip) (AR748.), 01-2014 (hip) (AR748.), 03-2015 (hip) (AR1182.), 06-2015 (Spine L4-L5, T8-T9) (AR1185-86.), 07-2015 (Spine L4-L5) (AR1184.), 09-2015 (Spine T8-T9) (AR1183.), 08-2016 (hip) (AR1931.), 09-2016 (hip, Spine S1/S2) (AR1851, 1932-33.).

55.     The persistence of posterior sagittal imbalance

to the degree exhibited by Thoma (5 cm) is implicated in the

pain she continues to suffer. *See* AR975, "Flat Back and Sagittal

Plane Deformity" (noting that "[p]ositive sagittal balance is

the most reliable predictor of clinical symptoms in patients

with spinal deformity" and "[s]agittal imbalance greater than 4

cm results in deterioration of pain and function scores over

time in most unoperated patients"); AR1232, "Treatment of

Symptomatic Flatback After Spinal Fusion," (noting that, after

revision surgery, "47 per cent [of patients] . . . continued to

lean forward and . . . 36 per cent . . . continued to have

moderate or severe back pain"). This pain is not necessarily

neurogenic in nature, but results from the added strain of

maintaining a compensatory posture. *See* AR975, "Flat Back and

Sagittal Plane Deformity" ("Patients with flat back deformity

have pain in the lower part of their backs because of muscle

fatigue resulting from forward inclination of the trunk

secondary to loss of lumbar lordosis"); AR1221, "Management of

Iatrogenic Flat-Back Syndrome," (noting that "[b]ecause of the

strain of trying to achieve erect posture, pain and fatigue may

be noted in the cervical, thoracic, and lumbar spine") and,

because "[t]he lumbar spine is at a biomechanical disadvantage,

... [t]his leads to fatigue as the day progresses"; AR2212, S.D.

Glassman, et al., "Correlation of Radiographic Parameters and

Clinical Symptoms in Adult Scoliosis," 30 Spine 682-88 (2005

("[S]agittal balance is the most important and reliable

radiographic predictor of clinical health status, as patients

with positive sagittal imbalance reported worse self-assessment

in pain, function, and self-image domains"); id. (noting that

this "observation . . . is consistent with the experience of

Emami et al., who demonstrated that patients with positive

sagittal imbalance after long fusions to the sacrum had

increased pain compared to patients with negative global

sagittal balance"); AR2218, "Characterization of Gait Function

in Patients with Postsurgical Sagittal (Flatback) Deformity,"

("This posture puts extra demand on the back extensors, causing

fatigue pain . . ., and can lead to anterior thigh and knee pain

. . . [as well as] upper back and neck pain . . . [resulting

from the] attempt to correct this abnormal posture by

hyperextending the unfused thoracic segments as well as the

cervical spine.").


56.   The existence of sagittal imbalance puts Thoma at

increased risk for pseudarthrosis (and, indeed, she has

exhibited an ongoing pseudarthrosis at the T8/T9 since 2013),

which constitutes a further source of pain. AR1232, "Treatment

of Symptomatic Flatback After Spinal Fusion" ("The failure to

restore sagittal plane balance led to a higher rate of

pseudarthrosis, which was associated with recurrent deformity");
AR2179, "Rationale of Revision Lumbar Spine Surgery" ("The risk
of pseudarthrosis has been associated with . . . longer fusions
(>12 vertebrae), thoracolumbar kyphosis >20 degrees,
osteoarthritis of the hip joint, positive sagittal balance ≥5
cm"); AR2193, "Current Concepts Review: Prevention and
Management of Iatrogenic Flatback Deformity," ("These
biomechanical stresses and the risk of subsequent pseudarthrosis
may be increased with progressive loss of sagittal balance;
thus, pseudarthrosis may be both a causative factor and a
complication of flatback syndrome, especially when lordosis is
not restored with operative treatment.").

47.    Thoma's hip/trochanter pain may be related to
the degenerative changes in her lumbar spine or the long-term
effects of compensating for her flatback condition. *See, e.g.*,
AR1308, D. Hugo, et al., "Greater Trochanteric Pain Syndrome,"
11 S.A. Orthopaedic J. 28-33, Autumn 2012 ("Walker et al. found
a higher incidence of GTPS [Greater Trochanteric Pain Syndrome]
in patients with degenerative spine disease"); AR2223,
"Characterization of Gait Function in Patients with Postsurgical
Sagittal (Flatback) Deformity," ("Back pain and thoracic
hypokyphosis are known problems associated with flatback," but
"[t]his study demonstrates that . . . the hip and knee joints

40

are also affected adversely in patients with flatback")
Similarly, the presence of lumbar degenerative changes and the
ongoing effects of flatback compensation are implicated in the
persistence of this pain, despite treatment. *See, e.g.*, AR1316,
Brigham & Women's Hospital, "Standard of Care: Greater
Trochanteric Pain Syndrome," 2007 ("In the Walker study, 'the
major predictor of relapse of ... lateral hip pain patients who
received an injection of local anesthetic and glucocorticoids .
. . was the presence of moderate to severe lumbar degenerative
disease seen on scintigraphic imaging.'").

        58.   Thoma has engaged in substantial pain-reduction
treatment efforts, including multiple surgeries, physical
therapy, steroid and analgesic injections, and an opioid-based
medication regimen. Thoma's pain medications would be expected
to limit her capacity for reliable focus, alertness, and
attention. *See* 12-28-2014 Garvey IME, AR672 et seq., at 67 ("Due
to the narcotic and mind altering medications I would limit her
from performing Safety Sensitive work duties"); 01-04-2017 Dr.
Vessa Letter, AR1759-60 ("Nor is Thoma capable of sustaining the
rigors of any regular, full-time work as the excessive pain
medication that would be required to sustain such work would be
contraindicated, and make her highly undesirable for competitive
employment"); 01-09-2017 Dr. Valenza Letter, AR1761-62 ("Any

41

increase in activity, such as would be required to engage in any kind of routine employment, would cause increased pain ... and would need to be supported with additional pain medication . . . I do not believe such an endeavor would be successful, as this would decrease Thoma's cognitive functioning (impairing her work performance and employability), would make her a danger to drive..., and would risk further surgeries, radiation exposure, etc.").

59. Both of Thoma's principal treating physicians, Dr. Vessa and Dr. Valenza, have consistently opined that Thoma is disabled from any regular employment. *See, e.g.*, 03-05-2014 Dr. Vessa Letter, AR870; 05-20-2014 Physical Ability Assessment, AR792-93; 10-12-2015 Dr. Vessa Letter and 0916-2015 Physical Ability Assessment, AR1174-77; 05-13-2016 Dr. Vessa Letter, AR1853-55; 09-27-2016 Vessa Physical Examination Report, AR1849-52; 01-04-2017 Dr. Vessa Letter, AR1759-60; 04-11-2016 Dr. Valenza Letter, AR1943; 01-09-2017 Dr. Valenza Letter, AR1761-62.

60. At the time of her appeal, Thoma also submitted a further supporting opinion from a third consulting physician, Dr. Dante Implicito. *See* AR1972-73 [08-05-2016 Implicito Physical Ability Assessment].

61.   Dr. Vessa is board-certified in Orthopedic Surgery, with a practice primarily concerned with spine surgery (AR1523-31), and at the time of his letters, he had treated Thoma for 10 years (AR1174, 1852).

62.   Dr. Valenza is board-certified in Physical Medicine & Rehabilitation and Pain Management (AR1962-71), and at the time of his letters, he had treated Thoma for 6 years (AR1943, 270, 821-22).

63.   Dr. Implicito is board-certified in Orthopedic Surgery, specializing in spine surgery. AR1974-82.

64.   In October 2015, Thoma provided a detailed description of the symptoms that she experiences as a consequence of her spinal condition and flatback deformity:

> I have pain at every level of my spine: in my neck/shoulders, in the thoracic area between my shoulder blades, and in my lower back/pelvis. Although this pain is not constant in each area at all times, there is always pain somewhere, and – except for the relief I experience when I lay down – this pain is generally severe and unrelenting.
>
> The pain in my neck is a sharp, stabbing pain at the base of my head which both travels up (causing migraine-type headache pain) and into my shoulders....

The pain in my thoracic area is a dull, punching pain
....

I experience fairly constant, extreme muscle spasms in
my lower back/upper buttock area. This pain is hard to
describe, other than that the pain feels exactly like what
you'd expect if you've had nails drilled into your bone.

There is a constant, severe, dull pain, as well as the
sensation that my pelvis is made of brittle glass that is
about to shatter with any additional stress or strain....

Although I am not pain free when I lay down, this
position affords the least stress on my vertebral column
and provides a significant reduction in the pain I
experience....

There are three major effects I experience from [my
flatback syndrome]:

(1) the inability to provide micro-relief to the
involved muscles puts great strain on the muscles,
resulting in significant muscle spasms and tension; (2)
over the course of a day, the maintenance of a fixed
position, and the build up of the associated spasming and
tension is extremely fatiguing, leaving me physically
exhausted; and (3) the ends of my fixed spine (my neck and
pelvis) are under extreme and unnatural levels of stress,
making them particularly susceptible to bony pain and
muscular spasm/tension/pain. I have developed bursitis in
my hips. No chair is truly comfortable for me…. [W]ithin a
few minutes, because of my inability to shift position, I
begin to experience increasing pain. Whether sitting or
standing, I tend to pitch slightly forward to alleviate the
pressure on my spinal column, but, as noted, this puts
additional stress on my neck and pelvis, causing muscle
strain and spasm which eventually occurs throughout my
back....

Standing is the worst activity for me. I immediately
feel the stress of my rigid spinal column on my lower back
and pelvis, producing severe and increasing lower back pain
(this is in contrast to sitting, where the pain tends to
affect my entire torso and is slightly less intense). As
with sitting, I tend to pitch forward when I stand....

44

Cold weather and the changes in barometric pressure
associated with precipitation, seem to amp up the pain to
an even higher level of intensity.

AR1195-1208 [10-14-2015 C. Thoma Letter].


65.   Thoma has consistently reported difficulties

with sitting for longer than 20 to 30 minutes, walking for

longer than 15 to 30 minutes, and standing longer than 10 to 20

minutes. *See, e.g.,* 01-15-2014, 01-24-2014, 01-29-2014, 03-04-

2014, 04-22-2015, 04-24-2015, 04-27-2015, 04-29-2015, 05-01-

2015, 05-04-2015 Kessler Rehab Notes, AR745, AR733, AR727,

AR724, AR1248, AR1252, AR1255, AR1261, AR1258, AR1263. These

limitations have been reviewed and endorsed multiple times by

Dr. Vessa in his Physical Ability Assessments ("PAAs"). *See* 05-

20-2014 Vessa PAA, AR792-93; 09-16-2015 PAA, AR1176-77.


66.   Thoma reports that her daily pain with these

activities is cumulative, and that increasing pain (and pain

medications) render her less functional as the day progresses:


Between 9 and 12 in the morning is my most productive
time of the day. My medications have kicked in sufficiently
enough that the morning "edge" is off, but not so
significantly that they have begun to dull my
attention/concentration. Also, I tend to get more and more
fatigued as the day wears on....

45

I take my second hydrocodone between 12 and 1PM. I usually lay down between 12PM and 3PM. This is not so much "nap" time as it is time to rest my back....

Between my pain, fatigue, and medication side effects, I do not feel safe as a driver by this time of the day [after 4PM]. By 5PM, my muscles are screaming with pain and spasm. I usually take a Valium around this time (I avoid taking it earlier in the day because I find it makes me particularly fuzzy/stupid).

AR1105-1208 (10-14-2015 C. Thoma Letter]. Thoma experiences these symptoms and limitations even though she is able to organize her own schedule and lay down for several hours each day. *Id.*

67.   On appeal, Thoma provided additional detail regarding her symptoms:

What prevents me from working is my inability to engage in these sorts of activities on a sustained basis, as would be required if I were to work 5 days a week, 8 hours per day. Both in terms of fatigue and pain, I am able to maintain manageable levels by limiting my activities, lying down midday, sleeping 9 hours a night, and taking my pain medications. Some activities are not impossible, but when I do them, they will take a toll later on. I will need to stop doing whatever else I hoped to do, I will need to take more medication. I will pay for that activity.

Sustained work that requires sitting, such as drafting a document like this, requires me to do so in small bits and pieces, with significant intervals in between. I must pace myself, which means it is harder for me to meet tight deadlines. When working at intervals, it is easy to become repetitive and to lose track of where I was going. Consequently, it takes more time overall to complete a longerduration project, as I must constantly revisit what

46

I've done at earlier intervals to make sure that what I've
written is coherent and doesn't repeat itself. In the
preparation of this statement, I have also relied on the
assistance of my attorney to help organize and draft the
letter.

        With an activity like sitting, I may be able to sit
for a longer period on a good day, or if I take significant
rest between sitting spells. However, if I attempted to sit
on a daily basis for the amount of time required to
maintain productive employment, my pain would increase and
my ability to sit would be more limited. In other words, I
have a finite capacity for sitting. If I am adequately
rested and have taken my medications, I may occasionally be
able to sit longer than usual. However, if I am being
required to sit on a sustained basis day in and day out, my
back will not be well rested and pain will develop faster
and with greater severity, so that my sitting intervals
will be substantially reduced. I would require increased
pain medication. This is also exhausting. For most people,
sitting seems effortless. For me, the rigor of maintaining
a posture that is comfortable and minimizes my pain takes
conscious attention and recruitment of muscles not
ordinarily relied upon by someone without my condition.
This is both mentally and physically draining.

AR1983-93 [11-07-2016 C. Thoma Letter].


        68. Thoma further reported that the accumulation of

pain, fatigue, and pain medication side effects causes her

cognitive difficulties and leaves her with decreased emotional

resources. AR1201 [10-14-2015 C. Thoma Letter] (""I have gotten

in the practice of writing everything down, or putting it on a

calendar, or list, because I have learned too many times that if

I do not do so, I will be embarrassed to discover that I have

forgotten or missed something"); *id.* ("The constant pain I'm in

now leaves me with limited reserves of patience and self-control.").

69.   Witness letters submitted – from Thoma's husband (Richard Thoma), pastor (Rev. Rick Morley), and hairdresser (Ricky Pennisi) – corroborate Thoma's reports of pain, and cognitive difficulties:

- **10-2015 Ricky Pennisi Letter (AR1652):** "Christine took immense pride in her work and was devastated by the problems her multiple back surgeries caused her. Since her surgeries, she has no longer been able to get her hair colored because she is unable to lean back into the sink chairs. She has also been forced to keep her hair cut appointments extremely short because of the discomfort she experiences, even with the help of a pillow. I often have my assistants help me with her to get her done quickly and painlessly."

- **10-05-2015 Rev. Richard Morley Letter (AR1651):** "When Christine is able to come to church with her family she sits in the very back of the church so that she can lean against the wall.... Because of her health, her attendance is sporadic.... She has spoken to me on multiple occasions about her pain and discomfort, and the emotional and mental toll that such pain puts on her. Christine has given me permission to be candid here. She is filled with guilt about the burden her limitations put on her family and friends. She especially worries about her ability to fully parent her two boys and what effect her need for constant rest has on them...."

- **10-12-2015 Rich Thoma Letter (AR1653-55):** "During the day Chris can usually stand for half hour intervals. At this point she needs to lay down to ease the pain. Sitting down does not make her feel better. She needs to lay down flat in order to do so. I can usually tell she is in pain because of the stiff motion of her body

48

when she walks. She also tends to be more hunched
over. She is usually more emotionally checked out and
more distant when she is in pain. Rain also makes It
worse for her condition. The wet weather will put her
in more pain due to the dampness that quickly affects
her back. In these conditions she is usually resting a
majority of the day. She does little cooking because
she has difficulty standing for long periods of time.
I do the Costco food shopping because she cannot lift
any heavy items in the store due to her pain. She
misses many events at our sons' school. Recently she
missed back to school night because her back was
bothering her from the day. She was not able to get
enough rest in the day and she was too exhausted to
venture out that evening. By the time I get home from
work she needs to rest her back by lying down, and she
goes to bed by 8pm due to the fatigue. Another issue
she is having is forgetting things. One of my first
memories of being concerned is when I came home from
work one evening and she left the gas burner turned on
the stove. She used to be on top of all the kids
sports schedules. Most of this was done simply by
memory alone. Now she needs to write everything down
in order to keep track.... I find it hard to talk to
her sometimes because her mind is elsewhere. Her
facial expressions constantly show a woman in pain.
She is not all that vocal regarding it, but I can tell
this by the way her mouth grimaces when she moves
around."


70.   Cognitive impairments are documented in the
medical literature for patients with chronic back pain – whether
due to the pain itself, opioid pain medications, or some
combination of the two. *See, e.g.*, AR1322 et seq., at 1336, O.
Moriarty, et al., "The Effect of Pain on Cognitive Function: A
Review of Clinical and Preclinical Research," 93 Progress in
Neurobiology 385–404, 2011 ("There appears to be sufficient
evidence from preclinical and clinical investigations to support

the theory that pain is associated with impaired cognitive function"); AR1342 et seq., at 1349, M. Schiltenwolf, et al., "Prospective Study: Evidence of Specific Cognitive Deficits in Patients with Chronic Low Back Pain under Long-Term Substitution Treatment of Opioids," 17 Pain Physician 9-19, Jan./Feb. 2014 ("Most importantly, the current study found that visual attention, information processing, graphomotor speed, visual scanning ability, and numeric sequencing ability are impaired in both patient groups [i.e., patients with chronic low back pain with or without long-term opioid therapy] in comparison to healthy controls, and, [a]dditionally, the executive function regarding working memory and cognitive flexibility of patients who underwent chronic opioid therapy was significantly hindered, which means that the opioids group may perform normally in simple tasks but performance could fall behind as the executive domain become more complex"); AR1353 et seq., at 1361, S. Tamburin, et al., "Cognition and Emotional Decision-Making in Chronic Low Back Pain: an ERPs Study During Iowa Gambling Task," 5 Frontiers in Psychology 1-11, Nov 2014 ("In conclusion, we documented that cLBP [chronic low back pain] patients show poor performance in DM [decision-making], as assessed with MCST and IGT" and "[t]hese abnormalities might contribute to the impairment in the work and family settings that often cLBP patients report").

50

71.    Both of Thoma's treating physicians found her
pain complaints to be entirely credible and consistent with her
medical history. Dr. Valenza, her pain management physician,
wrote:

> With [the equivalent of over 90 mq of morphine] she is
> able to perform her activities of daily living at home
> and is able to take care of her home as well as her
> children. I have advised her against returning to
> work. The amount of medication it would require to
> have her be able to travel to New York to work at Fox
> News as well as drive would definitely cause
> impairment in her cognition. Therefore, I do not
> believe that even increasing it to try to support that
> functional level would be successful. I also believe
> that trying to increase the medications further to
> support that level would definitely make her a danger
> to drive, to not only herself but to the community. I
> also do believe that the increased activity that would
> require, risk her to further radiation and further
> surgeries. At this point I do not see her [as a]
> candidate to return to any form of work. I am going to
> continue to try to support her activities of daily
> living as well as her home activities to the best of
> our ability without increasing her medications or
> doing procedures that put her and her family at
> further risk.

AR1943 [04-11-2016 Dr. Valenza Letter Response to Dr. Berman's
IME Report].


72.    LINA's first external medical reviewer, Dr. Karen
Garvey, opined that "I do believe that Thoma may experience pain
in the cervical, thoracic, lumbar and hip regions" and that

"[d]ue to the narcotic and mind altering medications, I would limit her from performing Safety Sensitive work duties." AR672-79 [12-28-2014 Dr. Garvey IME Report] at AR679.

73. Like Dr. Valenza, treating physician Dr. Vessa fully endorsed Thoma's disability:

> The symptoms she has described are consistent with my clinical observations and findings, with her medical history, and with her objective test results.... It should also be noted that Thoma's ability to engage in modest activities of daily living, interspersed with periods of rest, is achieved through an extraordinary regimen of pain medication, including Opana, Lyrica, Vicodin (Acetominophen/Hydrocodone), and Valium. This is heavy duty pain management, and could not be tolerated by a patient who was new to such treatment. Good pain management is a delicate balance between facilitating activities of daily living (with tolerable amounts of pain), while avoiding the complete fog of over-medication.... I reiterate the opinion I previously gave to CIGNA. Thoma can engage in isolated short-duration activities of daily living, but could not return to her prior occupation, nor to any reasonably comparable occupation, with similar demands and responsibilities. Moreover, I believe Thoma is incapable of sustaining the rigors of any regular, full-time work and, as noted, the excessive pain medication that would be required to sustain such work would be contraindicated, and make her highly undesirable for competitive employment.... I have treated and observed Thoma as a patient for ten years. The symptoms she has described are consistent with my clinical observations and findings, with her medical history, and with her objective test results.... I find Thoma to be a very straightforward person, and not someone who exaggerates.

AR1853-55 [05-13-2016 Dr. Vessa Letter]. Dr. Vessa also noted: "Even at her present level of medication, I would not hire her for a position in my office (and I think other employers would have similar reservations, particularly for any job with significant responsibilities)."

74.     On appeal, Dr. Vessa submitted an updated examination and opinion in which he emphatically repeated his opinion:

> I have cared for and participated in the surgery of numerous patients with flat back syndrome and in my experience, and as reflected in the medical literature, pain at the severity Mrs. Thoma describes is quite common in patients with flat back syndrome and the extensive spine surgery that she has undergone.... [I]t is my opinion that her condition is permanent…. [H]er vocational abilities are compromised.... She is unable to continue her chosen career.

AR1849-52 [09-27-2016 Dr. Vessa Letter] at AR1852.

75.     On appeal, Thoma submitted a vocational evaluation from Alberigi. In addition to his listed accreditations – Certified Rehabilitation Counselor, Licensed Professional Counselor, Licensed Social Worker, Certified Disability Management Specialist, and Associate of the Board of

Vocational Experts – Alberigi has 35 years of experience providing vocational and rehabilitation counseling and has served as a Vocational Expert for the SSA and Vocational Case Consultant for the U.S. Department of Labor ("DOL"). AR2080.

76. Alberigi's review included: Thoma's statements, Fox News's Job Description, physician opinions (from Drs. Vessa, Implicito, Garvey, and Berman), SSA records, and LINA's prior Transferable Skills Analysis ("TSA") and Exploratory Transferable Skills Analysis ("ETSA"). AR2054-55. Alberigi also conducted an employability interview with Thoma. AR2056-58.

77. Reviewing the LINA TSA prepared in relation to the termination of Thoma's claim, Alberigi identified several flaws:

a. Thoma's specific education, training and experience renders her unqualified for the Advertising and Promotions Manager position identified as an "alternate" occupation by that TSA. AR2075.

b. The TSA was based exclusively on the opinion of Dr. Berman, without regard for the substantial countervailing evidence. AR2071, 2073.

54

c.    The TSA failed to take account of Thoma's
reliance on opioid pain medications. AR2073, 2075.

d.    The TSA improperly lumped broad wage data
information together, even though that data included wages for
high-earning industries in which Thoma has no experience,
education or training. AR2075-78.

78.    Ultimately, Alberigi concluded that Thoma was
disabled under the LTD Plan's definition of disability:

> The vast preponderance of information made available
> leads me to conclude that Thoma is not capable of
> performing her prior occupation with Fox News as a Senior
> TV Producer, nor is she capable of performing the alternate
> occupation of Executive Producer, Promos/Advertising and
> Promotions Managers identified in CIGNA's 2016 TSA. In
> light of her physician documented restrictions as
> summarized in this report, as well as the Residual
> Functional Capacity determined by SSA and the results of
> the SSA Consultative Examinations, as well as the results
> of my Employability Interview, it is my conclusion that
> Thoma is incapable of regular, full-time employment in any
> occupation for which she is or might reasonably become
> qualified based upon her education, training or experience.
> This is so even without consideration of the LTD Plan's
> wage requirement of 60% or more of her Indexed Earnings.
> Based on the preponderance of the information I reviewed,
> including SSA's determination that Thoma is incapable of
> substantial gainful activity, it is also my opinion that
> Thoma is incapable of maintaining regular, full-time
> employment that would satisfy the wage requirement.

AR2054-79 [09-20-2016 Alberigi Vocational Evaluation Report] at 2078.

79.    LINA's termination was based exclusively on the IME Report of Dr. Berman, a vocational assessment TSA, and LINA's surveillance. AR386-89 [05-13-2016 LINA Termination Letter].

80.    On physical examination, Dr. Berman found a litany of normal findings, including no tenderness, no spasm, no weakness, and no pain to palpation throughout Thoma's cervical and thoracolumbar spine and hips. AR1062. Neither on personal examination nor in the video surveillance did Dr. Berman see any evidence of abnormal gait. AR1061-62, AR1064.

81.    Dr. Berman itemized the medical records he reviewed, but otherwise did not discuss, synthesize or weigh those records, other than to say that the "Radiological studies brought to the evaluation by the claimant were reviewed by me in great detail, and demonstrated findings expected and consistent with the claimant's surgical history, and did not demonstrate findings consistent with functional limitations or disability." AR1065. Although he did not personally review the surveillance as part of his initial report, LINA requested that he do so and

provide an addendum, but his opinion remained the same. AR88
[ACCLAIM Note] ("Attorney provided request for clarification
regarding info reviewed in IME and SIU was received. Addendum
request sent to Dr. Berman. Amended report received 3/9/2016 and
Dr. Berman opined additional info did not change prior
opinion.")

82.   Dr. Berman did discuss the physical examination
findings noted by other physicians and did not explain why he
rejected Thoma's subjective complaints of pain, the opinions of
Thoma's treating physicians, or the substantial medical
literature corroborating the presence of debilitating pain in
flatback patients. *Id.*

83.   Dr. Berman did not explain why the evidence of
Thoma's condition – such as (1) sagittal imbalance and other
postural abnormalities, (2) abnormal gait, (3) thoracic
pseudarthrosis, (4) greater trochanter/hip pain, (5)
degenerative changes of the spine, (6) spinal tenderness and
reduced spinal flexibility, (7) lower extremity/lumbar muscle
stiffness/weakness/abnormalities, and (8) significant pain
medication and treatment – failed to corroborate and support
Thoma's complaints of pain. *Id.*

84. Ultimately, Dr. Berman concluded that Thoma has no functional deficits whatsoever, and was able to return her former occupation, "full time full active duty." *Id.*

85. Had LINA not rushed to terminate Thoma's claim, it would have received Dr. Vessa's assessment of Dr. Berman's IME Report, which was later submitted as part of Thoma's appeal:

> I disagree with Dr. Berman's conclusions and, indeed, some of his physical findings seem difficult to believe, given Thoma's medical history and my long-term care of this patient. In particular, Dr. Berman purported to examine Thoma's cervical and thoracolumbar spine and to find absolutely no pain, tenderness, spasm or atrophy throughout. On repeated examination of Thoma, I have observed tenderness and spasm of her cervical and thoracolumbar spine, and have regularly observed it in the thoracolumbar region. Moreover, she has definite paraspinal muscle atrophy over the region of (and associated with) her massive surgical scarring. Given Thoma's flatback syndrome and extensive spine surgery history, it would be surprising if she exhibited no physical examination findings of pain, tenderness, spasm and atrophy. Flexible open spinal levels must adapt to the static fused spinal levels, resulting in tenderness and spasm from compensatory and unnatural overuse. Indeed, such findings are so routine in a patient like Thoma that I do not generally include them in my office notes, where they would be redundant. Dr. Berman's failure to find pain, tenderness, spasm or atrophy anywhere throughout Thoma's cervical and thoracolumbar spine, is unbelievable, and causes me to question the credibility of his findings and conclusions.

*See* AR1854 [05-13-2016 Dr. Vessa Letter].

86.     Neither Dr. Berman nor LINA made any effort to reconcile Dr. Berman's conclusion that Thoma had full work capacity for her own occupation with LINA's prior payment for two years of "own occupation" benefits based on multiple LINA medical assessments. *Id.;* AR386-89 [05-13-2016 LINA Termination Letter].

87.     The TSA performed in conjunction with the termination of Thoma's claim was based entirely on one medical opinion − Dr. Berman's. AR1056-57 [01-25-2016 TSA].

88.     Based on Dr. Berman's findings, TSA concluded that Thoma was capable of performing her former occupation of "producer." *Id.*

89.     Neither LINA (in its denial letter or internal deliberations) nor the TSA evaluator explained the apparent discrepancy between this determination and LINA's own prior determinations that Thoma was disabled from her own occupation, or SSA's determination that Thoma was incapable of "any substantial gainful activity." AR1056-57 [01-25-2016 TSA]; AR386-89 [05-13-2016 LINA Termination Letter].

90.    Although LINA conducted three total rounds of
surveillance (a total of 11 days) in June 2014, October 2014,
and June/July 2015, LINA relied solely on three activities in
the 2015 surveillance, one occasion of Thoma sitting for "over
thirty minutes," one occasion of her "carrying a red bag and
folding chair over her shoulder," and one occasion of Thoma
"standing for over forty-nine minutes in a sports field" in
making its termination decision. AR386-89 [05-13-2016 LINA
Termination Letter], at AR387. LINA made no reference to the
prior surveillance, and LINA continued to pay Thoma LTD benefits
throughout that period and continued to acknowledge she was
disabled and entitled to benefits. *Id.*

91.    Treating orthopedic surgeon, Dr. Vessa, viewed
the surveillance and explained why it did not surprise him or
change his opinion of Thoma's disability:

> The surveillance film from June/July, 2015 is not
> substantially different from the surveillance film I
> previously reviewed. The new surveillance again shows
> Thoma engaged only in moderate activities of daily
> living. None of the activities documented are extreme.
> She does not run or kick a ball with her children. She
> walks, stands, sits, and carries low weight items. She
> engages in these activities for short durations of
> time, generally not more than 10 minutes, and, on
> occasion for only modestly longer durations — perhaps
> 45 minutes or so. In walking activities, Thoma
> demonstrates a slow, distinct gait, slightly leaning
> forward, with stiffness in the hips, that is

characteristic of flat-back syndrome, although on many occasions, Thoma is partially obscured, so that it is difficult to see her for the entire duration. On most of the days, Thoma engages in activities outside the home that last several hours, at most, and then she returns to her home and is inactive the rest of the day. She carries a handbag. She drives a car for short distances, or sits on her porch while chatting on the telephone or looking at a small tablet. She lifts and carries a lightweight aluminum folding chair (over her shoulder) for the short distance from a local pool to her car, in a dedicated parking area for the pool. There are long periods of time between the filmed activities, when she is apparently resting.

I have treated and observed Thoma as a patient for ten years. The symptoms she has described are consistent with my clinical observations and findings, with her medical history, and with her objective test results. The activities documented on surveillance are consistent with those she has reported to me and it is my opinion that they do not in any way contradict the restrictions and limitations I have previously provided, nor do they contradict Thoma's reported pain or disability.

AR1854 [05-13-2016 Dr. Vessa Letter]. *See also* AR1174-75 [10-12-2015 Dr. Vessa Letter] (addressing earlier surveillance.)


92.    Responding to the significance Dr. Berman attributed to the surveillance activities, Dr. Valenza also explained why those activities did not surprise him or change his opinion of Thoma's disability. AR1943 [04-11-2016 Dr. Valenza Letter].


93.    Thoma explained that the surveillance did not contradict what she had reported to LINA as her activities, nor

61

do they contradict her disability. AR1989-92 [11-07-2016 C. Thoma Letter].

94.    At the appeal stage, LINA retained Dr. Howard Grattan to conduct a paper review of Thoma's claim. AR1783-90 [01-13-2017 Dr. Grattan Peer Consultant Report].

95.    It appears that the documentation reviewed by Dr. Grattan included Alberigi's vocational evaluation report and the SSD claim file information, amid a plethora of medical and other documentation. AR1783-1790, at 1788.

96.    Dr. Grattan provided a 4-sentence summary synopsis of Alberigi's report, but no actual assessment of the report. AR1797-98.

97.    Although Dr. Berman's report is listed as an item Dr. Grattan reviewed (AR1784), the report is not further discussed other than to note that Thoma's providers disagreed with his assessment. AR1797

98.    Dr. Grattan lists and describes the surveillance, but he nowhere makes any findings or draws any conclusions from this evidence. AR1785, AR1787, AR1794, AR1795.

99.    Dr. Grattan's report contains no discussion of the SSA claim file's vocational reasoning and rationale, as set forth in the SSA Disability Determination Explanation. *Id.*

100. The first nine pages of Dr. Grattan's report are little more than a list of the evidence he examined. AR1783-91. The last 7-page "Clinical Summary" (AR1793-99) is a descriptive summary of the evidence (without any evaluative commentary or assessment), and the gist of his opinion is contained in the 2-page Recommendations/Rationale (AR1792-93).

101.    The Recommendation/Rationale includes several additional descriptive summaries of selected medical evidence but does not explain why these were selected from the remainder of the evidence or how they are logically related to his opinion. *Id.*

102. Dr. Grattan concedes that Thoma (i) is limited, (ii) has an "extensive surgical" history, (iii) has "alteration of spinal kinesiology," and (iv) that "medically necessary work and activity restrictions are required." AR1792.

103. Dr. Grattan rejected Thoma's described severity of pain and instead focused on an assessment of what the "objective" evidence suggested about her physical functional ability. He concedes that Thoma's "reports of pain are appreciated and are explained by her history of extensive surgery," and rejects those complaints because "the objective findings do not explain why the claimant would not have the ability to function within the restrictions outlined below" AR1791-92 [01-13-2017 Dr. Grattan Peer Consultant Report]. This is similar to a finding made by Dr. Garvey, an earlier LINA medical consultant. AR679 ("[A]lthough I do believe that Thoma may experience pain in the cervical, thoracic, lumbar and hip regions, the subjective complaints of limitations outweigh the objective findings and observations.").

104. Dr. Grattan summarized the findings and opinions of Dr. Vessa and Dr. Valenza, but did not provide a critical assessment of their opinions or why he disagrees with them. After receiving responses to his questions, he dismissed these responses, stating that they "[did] not change my opinion as the providers are describing pain reports without ongoing neurological deficits." AR1791. Dr. Grattan has not described the specific neurological deficits that would satisfy him, nor

has he explained why the various objective abnormal findings documented in Thoma's medical record are insufficient.

105. Dr. Grattan supplies very specific restrictions and limitations, AR1793, but does not explain why these particular restrictions are supported by the "objective" evidence, while the restrictions supplied by Dr. Vessa, Dr. Valenza, and Dr. Implicito are not.

106. Dr. Grattan's restrictions and limitations are:

> From a physical medicine and rehabilitation and pain perspective, the claimant is functionally impaired, but not restricted from all work activity. Medically necessary work activity restrictions include lifting, carrying, pushing and pulling 10 pounds occasionally and less than 10 pounds frequently. No climbing ladders, poles or working at unprotected heights. No operating heavy machinery. No crawling or balancing. Occasionally kneeling, squatting, crouching, and climbing stairs. Reaching overhead and below the waist occasionally; reaching at waist level is without restrictions. Fingering, handling, feeling, gripping and grasping may be done constantly. Walking and standing combined for 10 minutes continually and up to two hours per day. Sitting is restricted to 60 minutes continually, up to six hours per eight hour day.

AR1793.

107. None of LINA's examining or paper review physicians have alleged that the evidence suggested that Thoma

65

was malingering, exaggerating or otherwise dissembling her condition or pain. AR1783-90 [01-13-2017 Dr. Grattan Peer Consultant Report]; AR1060-65 [12-16-2015 Berman IME Report]; AR672-79 [12-28-2014 Dr. Garvey IME Report].

108. Dr. Grattan opined that "[o]bjectively, there is no evidence of motor weakness." AR1792. However, he does not identify the record on which that determination is based.

109. Dr. Grattan opined that "there was no evidence of adverse [opioid pain medication] side effects nor is there evidence that suggests the claimant is cognitively impaired," AR1973, but did not address Dr. Vessa's and Dr. Valenza's statements that her medication would need to be increased so as to allow her to perform the duties of a sedentary occupation.

110. LINA provided its vocational consultant with Dr. Grattan's report. AR67 [Appeals TSA" Request] ("Please complete Appeals TSA based on R/Ls obtained from PR Report completed by Dr. Howard L. Grattan...."); AR1778-80 [01-20-2017 Transferable Skills Analysis] ("Occupations were identified based on the Peer Review by Dr. Grattan dated 1/13/17").

111. The TSA on appeal was conducted by Melissa Mendez, a vocational rehabilitation consultant who was involved in the TSA obtained at the time Thoma's claim was terminated. AR1055, AR1058, AR1778-79.

112. LINA provided Ms. Mendez with neither the Alberigi Report, nor the SSA Disability Determination Explanation, which included its own vocational assessment. AR2080-151; AR2034-49; AR2047-49.

113. The TSA purported to find alternate occupations Thoma was able to perform and that satisfied the Plan's wage requirement. AR1778-80. In its letter dated January 27, 2017, LINA upheld its termination of Thoma's LTD Plan benefits based on these two opinions. AR371 et seq.

114. With regard to SSA's claim file, the LINA appeal denial letter explained that "[t]he claim file has been reviewed in its entirety, as a whole" but that "[t]he criteria used by the SSA may differ from the requirements of the policy under which your client is covered." AR373.

115. Although Thoma contended that (i) SSA's criteria do differ and, indeed, are more stringent, and (ii) no special

rules were applied in her case, LINA did not state specifically how the criteria differed, or how that difference was relevant to LINA's determination that the SSA information be given no weight. *Id.*

116. LINA's ACCLAIM Notes state: "SS award is relevant and was given consideration in my consideration . . . Information from SSA was reviewed by Board Certified Physicians in PMR. Claim file reviewed in its entirety, as a whole. Proceeding with claim decision." AR63. LINA's internal policies and procedures provide that a claim examiner should:

- Document the specific information or circumstances supporting the determination that the award is of lesser or no relevance in the claim file;
- Clearly explain to the claimant in writing the basis(es) for the determination that the award is of lesser or no relevance. That explanation should include the specific information, circumstances and/or policy language relevant to the determination and its relation to the Disability liability decision.

AR2312.

**IV. Conclusions of Law**

1. **The LTD Plan is an ERISA plan and is subject to ERISA law and regulations.** ERISA §§ 3(1), 3(3), 4(a), 502(a)(1)(B)

and (a)(3), 29 U.S.C. §§ 1002(1) and (3), 29 U.S.C. § 1003(a), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).

## 2. The Benefits Determination is Subject to *De Novo* Review.

In an action brought by a plan beneficiary to recover plan benefits under § 1132(a)(1)(B), "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Language that confers discretionary authority must be clear, as "[a]mbiguities are construed in favor of the plan beneficiary." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008). Discretionary language in non-Plan auxiliary documents, such as summary plan descriptions ("SPDs"), is ineffectual. *See, e.g., CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011); *Durham v. Prudential Ins. Co. of Am.*, 890 F.Supp.2d 390, 395-96 (S.D.N.Y. 2012).

Here, the Group Policy contains no discretionary authority and it contains an integration clause: "[t]he entire contract will be made up of the Policy, the application of the Employer, a copy of which is attached to the Policy, and the applications, if any, of the Insureds." AR40.

The document that Defendants advance as conferring discretion is the Appointment of Claim Fiduciary ("ACF"). AR1. However, this argument fails. The ACF was never disclosed before the commencement of this action, is not an amendment, and was not endorsed on or attached to the Group Policy. *Id.* Neither LINA nor Fox News provided the ACF as part of the Group Policy, and while the ACF "authorized the issuance of appropriate amendments," no such amendment was ever proffered. *Id.*

In *Barbu v. Life Ins. Co. of N. Am.*, an identical LINA ACF was deemed insufficient to confer discretionary authority. 987 F.Supp.2d 281, 286-289 (E.D.N.Y. 2013) (citations omitted). There, the court noted that the ACF could not be enforceable as an amendment to the Policy, because the "the amendment provision require[d] any amendment to be 'endorsed on, or attached to, the Policy,'" but the plaintiff had not received the ACF until discovery and the defendant made no attempt to show that the ACF otherwise complied with the amendment provision. *Id.* at 288 n.4. (citations omitted). For these same reasons, the ACF here is not part of the Plan and the proper standard of review as to the benefits determination is *de novo*.

Even if the Policy did confer discretionary authority, *de novo* review would still be appropriate because Defendants have failed to demonstrate that they complied with ERISA's procedural regulations. *See Halo v. Yale Health Plan*, 819 F.3d 42, 57-58 (2d Cir. 2016) ("[A] plan's failure to establish or follow the claims-procedure regulation entitles the claimant to have his or her claim reviewed *de novo* in federal court."); *Schuman v. Aetna Life Ins. Co.*, 2017 WL 1053853, at *12 (S.D.N.Y. Mar. 20, 2017) (applying *de novo* review instead of arbitrary and capricious review because defendants failed to establish that they substantially complied with ERISA's claims-procedure regulation).

In this case, LINA violated ERISA's procedural regulations in two ways. First, LINA violated the ERISA regulations by withholding the Alberigi vocational evaluation report from its vocational consultant and failing to consider that report on review, and also by withholding from its vocational consultant the SSA Disability Determination (which included its own vocational assessment). AR2080-151; AR2034-49; AR2047-49. These actions violated the ERISA provision requiring LINA to provide a "review that takes into account all comments, documents, records, and other information submitted by the claimant." 29 C.F.R. § 2560.503-1(h)(2)(iv) (applied to

disability claims via 29 C.F.R. §2560.503-1(h)(4)). *See, e.g.,*
*Aitken v. Aetna Life Ins. Co.*, 2018 WL 4608217, at \*38-43
(S.D.N.Y. Sept. 25, 2018) (*de novo* review proper where defendant
did not demonstrate that it took vocational evaluation into
account in its decisionmaking process, nor that its failure to
do so was inadvertent and harmless); *Schuman v. Aetna Life Ins.
Co.*, 2017 WL 1053853, at \*16 (D. Conn. Mar. 20, 2017) (defendant
violated ERISA by relying on medical consultant's assessment of
claimant's vocational report).

LINA also violated ERISA's procedural regulations when
it failed – despite requests from Thoma – to produce (i) SIU
Claim Referral forms or (ii) applicable internal policies. ACW
Decl. ¶ 19 & Ex. 3. ERISA requires that there be a procedure to
make "relevant documents" available to the claimant on appeal.
29 C.F.R. §§ 2560.503-1(h)(2)(iii). ERISA defines "relevant
documents" as including any document that "[d]emonstrates
compliance with the administrative process and safeguards
required pursuant to paragraph (b)(5)," which in turn requires
that the claims procedures ensure that plan provisions are
applied in a consistent manner, as well as any document that
"constitutes a statement of policy or guidance with respect to
the plan concerning the denied treatment option or benefit for

the claimant's diagnosis." 29 C.F.R. § 2560.503-1(m)(8)(iii), (iv).

It appears that LINA concedes that the SIU Claim Referral forms and the SIU/Surveillance Instruction form are part of the record. ACW Decl. ¶ 19(b). The internal guidelines at issue here are relevant to a consideration of whether the claims procedure was applied consistently. *See Schuman v. Aetna Life Ins. Co.*, 2017 WL 1053853, at *16 (D. Conn. Mar. 20, 2017); *Kruk v. MetLife Ins. Co.*, 267 F.R.D. 435, 437-38 (D. Conn. May 27, 2010); *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 124 (1st Cir. 2004). These policies and procedures were specifically requested in counsel's request for the administrative record, but were provided to Thoma for the first time as part of discovery in this case. *See* ACW Decl. ¶ 19(b), Ex. 3.

In light of the above, Thoma's benefits determination is subject to a *de novo* standard of review.

**3. Thoma is entitled to LTD benefits from May 13, 2016 to the present.**

ERISA provides that a "civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his future benefits under the terms of the plan." *DeCesare v. Aetna Life Ins. Co.*, 95 F.Supp.3d 458, 479-80 (S.D.N.Y. 2015) (citing 29 U.S.C. § 1132(a)(1)(B)).

"[U]pon *de novo* review, a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence." *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 296 (2d Cir. 2004). Under this standard, the claimant must prove by a preponderance of the evidence that she is disabled within the meaning of the plan. *See, e.g., Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006); *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d Cir. 2002). Here, that means Thoma must show that she is "unable to perform the material duties of any occupation for which . . . she is, or may reasonably become, qualified based on education, training or experience" and "unable to earn 60% or more of . . . her Indexed Earnings." AR20.

LINA terminated Thoma's claim based on Dr. Berman's IME report, the TSA (which considered Dr. Berman's opinion to

the exclusion of all other medical evidence in LINA's
possession), and the 2015 surveillance. AR386-89; ACW Decl. Ex.
3. However, the evidence provided by these materials does not
outweigh the evidence supporting Thoma's claim.

Dr. Berman, in making his determination that Thoma was
fully able to return to her former occupation, did not explain
why he rejected Thoma's complaints, the opinions of her treating
physicians, or the medical literature corroborating her
experience. AR1065; AR88. Moreover, there was no attempt to
reconcile Dr. Berman's conclusions with LINA's prior benefit
payments to Thoma (which were based on several medical
assessments made by LINA) or SSA's determination that Thoma was
incapable of "any substantial gainful activity." AR1854; AR386-
89, AR1056-57; AR386-89.

Additionally, although LINA's surveillance in 2015
revealed that Thoma sat for over 30 minutes, carried a bag and
folding chair over her shoulder, and stood for over 49 minutes
in a sports field, Dr. Vessa and Dr. Valenza--two of Thoma's
treating physicians--found that these activities are not
inconsistent with Thoma's reported disability. AR386-89, AR1854,
AR1174-75, AR1943. Dr. Vessa also noted that there are "long

periods of time between the filmed activities, when [Thoma] is apparently resting." AR1854.

On appeal, LINA enlisted the assistance of Dr. Grattan to conduct a paper review of Thoma's claim. AR1783-1798. Dr. Grattan found that Thoma could function within a set of specific restrictions, but offered little by way of substantive analysis, particularly any discussion as to why his opinion differed from the opinion of other evaluators who had previously assessed Thoma's condition and ability to return to work. *Id.* Also as part of the appeal, LINA's vocational consultant determined that Thoma was able to perform alternate occupations that satisfied the Plan's wage requirement. AR1778-80. While LINA provided its vocational consultant with Dr. Grattan's report, it did not provide her with Alberigi's report or the SSA Disability Determination Explanation. AR2080-151; AR2034-49; AR2047-49.

At the same time, there is ample evidence in the record that Thoma is entitled to LTD benefits under the Plan.

Thoma has suffered from scoliosis-related health problems for the majority of her life, having had her first correctional surgery at 14 years old and several more after that. AR727, AR922, AR1248, AR1761, AR1853, AR1983, AR1540,

AR1759, AR1853, AR1983, AR2026. The abnormalities resulting from her condition and surgical history have been documented on multiple occasions by various evaluators. As a result of the pain she experiences, Thoma has engaged in pain-reduction treatment efforts that may reasonably be expected to limit her ability to focus, and remain alert or attentive. AR672 et seq.; AR1761-62; AR1105-1208; AR1983-93; AR1201. Medical literature details the impairments associated Thoma's first surgery, particularly the risk of developing flatback syndrome, and corroborates Thoma's complaints more generally. *See, e.g.*, AR2165, AR590, AR1322 et seq., AR1342, AR1353. Witness statements support the characterization of Thoma as someone who loved her work but is severely restricted in her actions as a result of her condition. AR1652, AR1651, AR 1653-55. There has been no allegation from any of Thoma's numerous examining or paper review physicians that she was exaggerating her pain. AR1853-55; AR1783-90; AR1060-65; AR672-79.

LINA approved Thoma for disability benefits, after its own medical examinations, several times. AR304-32; AR21; AR51; AR275-770; AR249-51; AR672-79; AR209-10; AR200-01; AR194. The findings in those examinations echo Thoma's present and past complaints, for example, that she has difficulty sitting for extended periods of time. *See, e.g.*, AR1195-1208; AR745; AR733;

AR727; AR724; AR1248; AR1252; AR1255; AR1261; AR1258; AR1263; AR792-93; AR1176-77. In 2014, LINA prompted Thoma to apply for social security benefits, apparently on the presumption that her disability would continue. AR264; AR268; AR806; AR33.

The SSA found Thoma's claims credible and consistent with objective medical evidence, and that she was continuously disabled under Social Security's rules. AR2054-62. Additionally, the SSA opted not to review Thoma's medical evidence again until three years after it made this determination, as it deemed that "cessation of disability, as defined by SSA, is unlikely/improbable during the intervening 3-year interval." *Id.* While the SSA decision is not conclusive, it is surely a relevant piece of evidence in support of Thoma's claim. *See Billinger v. Bell Atlantic*, 240 F.Supp.2d 274, 285 (S.D.N.Y. 2003). Its evidentiary value is particularly clear here, where the SSA finding is corroborated by evidence in the administrative record. *Cf. Alfano v. CIGNA Life Ins. Co. of N.Y.*, 2009 WL 222351 at *17 (S.D.N.Y. Jan. 30, 2009) ("Because it is probative of [plaintiff's] entitlement to benefits under the Plan, and is corroborated by record evidence establishing Alfano's disability, the Court accords the SSA determination substantial weight.").

Both of Thoma's principal treating physicians have stated that Thoma is disabled from any regular employment. AR870; AR792-93; AR1174-77; AR1853-55; AR1943. These physicians found Thoma's complaints to be entirely credible and consistent with her lengthy medical history. AR1943; AR672-79; AR1853-55; AR1849-52.

Alberigi, who has 35 years of experience providing vocational and rehabilitation counseling and who has served as a Vocational Expert for the SSA and Vocational Case Consultant for the DOL, disagreed with several of LINA's findings. AR2080. Of particular note, Alberigi found that the TSA was based exclusively on the opinion of Dr. Berman, without consideration of countervailing evidence, and failed to take into account Thoma's reliance on pain medications. AR2054-58. Additionally, Alberigi found that the TSA improperly calculated the wage data. *Id.* For these and other reasons, Alberigi concluded that Thoma was disabled under the LTD Plan's definition of disability. *Id.*

In sum, Thoma has shown by a preponderance of the evidence that her long history of health troubles related to her spine, hip, and other conditions, as well as the medications required to treat the pain associated with those difficulties, has left Thoma "unable to perform the material duties of any

occupation for which . . . she is, or may reasonably become, qualified based on education, training or experience" and "unable to earn 60% or more of her Indexed Earnings." As a consequence, Thoma's claim is reinstated; she is entitled to LTD Plan benefits from May 13, 2016 to the present.[4] *Paese*, 449 F.3d at 441; *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999).

## 4. Thoma is entitled to pre-judgment interest and her reasonable attorneys' fees.

### A. Reasonable Attorneys' Fees and Costs

ERISA's fee shifting provision provides that the court "in its discretion may allow a reasonable attorney's fee and costs . . . to either party." 29 U.S.C. § 1132(g)(1). "It is well-established that 'Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights.'" *Donachie v. Liberty Life Assur. Co. of Boston*, 745 F.3d 41, 45-46 (2d Cir. 2014) (quoting *Slupinski v. First Unum*

---

[4]     Thoma is entitled to an award of benefits, as opposed to remand, because the difficulty is not that the administrative record was incomplete, but that a denial of benefits based on the record was unreasonable. *Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 648 (2d Cir. 2002) (internal citation and quotation marks omitted).

*Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009)). "[W]hether a plaintiff has obtained some degree of success on the merits is the sole factor that a court must consider in exercising its discretion" to award attorneys' fees. *Id.* at 46 (citing *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 254-255 (2010)).

Thus, because she has had "some degree of success on the merits," Thoma is entitled to her reasonable attorneys' fees and costs. *Cf. Donachie*, 745 F.3d at 46 ("[I]n light of the ERISA fee provision's statutory purpose . . . granting a prevailing plaintiff's request for fees is appropriate absent some particular justification for not doing so.") (quotation marks and internal citations omitted). ; *Alfano v. CIGNA Life Ins. Co.*, 2009 U.S. Dist. LEXIS 28118, at *2-3 (S.D.N.Y., Apr. 2. 2009).

## B. Pre-judgment Interest

The decision to award prejudgment interest to a successful ERISA claimant, "like the decision to award attorney's fees, is committed to the sound discretion of the district court." *Slupinski*, 554 F.3d at 53-54. Moreover, "like an award of an attorney's fees for a successful ERISA claim by an employee benefit plan participant, prejudgment interest is an

element of [the plaintiff's] complete compensation." *Id.* "[T]he factors that the district court is to consider in determining whether to award prejudgment interest are (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.* at 55.

Thoma is entitled to pre-judgment interest because of the equities, the need to fully compensate Thoma, and the remedial purposes of ERISA.

## V. Conclusion

Based on the findings of fact and conclusions of law set forth above, Plaintiff's motion for judgment on the administrative record is granted and Defendants' motion for judgment on the administrative record is denied.

It is so ordered.

New York, NY
December //, 2018

_____

ROBERT W. SWEET
U.S.D.J.